[Crim. No. 10801. In Bank. July 7, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. OLIVER STANLEY WILLIAMS, Defendant and Appellant.

Francis Heisler, under appointment by the Supreme Court, Richard M. Silver and Heisler & Stewart for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Jack E. Goertzen and Richard D. Huffman, Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—Defendant appeals from a judgment of the Superior Court of Los Angeles County convicting him upon a jury verdict of first degree murder. (Pen. Code, § 187.) The jury returned the death penalty. As a result, this appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On April 22, 1965, we reversed a similar judgment against defendant and his then codefendant because a confession was admitted into evidence without compliance with *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], as followed by this court in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (*People* v. *Lilliock*, 62 Cal.2d 618 [43 Cal.Rptr. 699, 401 P.2d 4].)

The remittitur issued on June 22, 1965. The matter was not calendared until September 24, 1965. On October 18 Williams moved under Penal Code section 1382 to dismiss the action since it was not brought within the 60 days fixed by statute. The motion was granted. A new information was filed and Williams was immediately rearrested under it. Defendant's subsequent motion to set aside this information under Penal Code, section 995, was denied.

Williams, and his codefendant Lilliock, were charged with murder. (Pen. Code, § 187.) Williams was also charged with five prior felony convictions. On March 1, 1966, Williams' motion to sever the trials was granted. Williams pleaded not guilty and admitted the prior convictions. The court accepted only four of the priors, inasmuch as defendant contended that he was not represented by counsel on a conviction for escape.

The sufficiency of the evidence is not challenged. It is sufficient, and may be summarized as follows:

Arthur Kretchman, the victim, resided at the Lincoln Park Motel near downtown Los Angeles. On October 28, 1962, about 10 p.m., a neighbor heard thumping and groaning noises emanating from the Kretchman cottage. He stepped outside and the noises stopped. He noticed that the cottage was dark. He then went back inside, but after again hearing the noises he returned outside. He observed a man, subsequently identified as William R. Lilliock, standing on the porch. Lilliock told him that he was Kretchman's nephew and that ''they'' had put Kretchman to bed because he had a little too much to

drink and had gotten unruly. The neighbor went back into his house and later observed two persons drive off in Kretchman's car. He could not identify them. Another neighbor, Edward C. Leipleim, corroborated the occurrences, and identified the driver of the car as Williams and the passenger as Lilliock.

Kretchman was found dead inside the cottage. One hand was tied to the refrigerator, the other was tied to the stove, both feet were bound, and his mouth gagged. According to the investigating officer Kretchman's pockets were turned inside out. Pry marks were found on the door and door frame. The screen above the sink was hanging on one hinge and pushed inward. Scattered about the interior of the cottage were various food packages, clothing and miscellaneous items. Williams' and Lilliock's fingerprints were found at many locations in the cabin.

The autopsy physician testified that death was caused by asphyxia due to strangulation. The bruises on the victim's head that he observed were caused by four separate blows, and none of them contributed to death. A blood test disclosed that the victim had not ingested any alcohol.

Williams and Lilliock were arrested near Needles while driving Kretchman's car. Two Los Angeles police officers were sent to return them to the city. The officers questioned them separately at the sheriff's office in Needles.

Concerning the admissibility of the statements made by Williams, Lechner, one of the officers who is now privately employed, testified as follows:

Lilliock, who was examined first, inquired whether the officers were attorneys. Lechner told him that they were officers, and informed Lilliock of his "constitutional rights." Williams was then brought into the room. Lechner testified, "I took the initiative right away and told him that we were police officers, and I introduced him to the officers that were there, as Lieutenant Schumacher, Sergeant Zell and myself. I also advised him at that time that we were police officers again, and not attorneys, and from the looks of things he needed an attorney, and it was his prerogative either to hire one or wait until he was in Los Angeles and have one assigned. In the meanwhile, he could keep still if he chose to." In response to questions, Williams then gave his name. He said he was from Pittsburgh, Pennsylvania, and had been in Los Angeles one week. Williams said he was unemployed. He claimed that he picked up the car in which he was arrested

at 5th and Main Streets because it had the keys in it. He refused to answer any further questions.

Mr. Joseph Busch, Jr., a Los Angeles deputy district attorney, testified that the officers' statements were not a recent fabrication. Mr. Busch had issued the complaint and made a memorandum of his discussion with the officers which stated that the suspects had been informed of their constitutional rights. He said he vividly remembered the conversation because he thought it was humorous that the officers had been mistaken for attorneys.

For the limited purpose of opposing the admission of his statements, Williams testified denying that he was given any warning at all.

The trial court ruled that there had been "substantial compliance" with *Escobedo* and allowed Lechner to repeat his testimony before the jury.

After the suspects were returned to Los Angeles, Leipleim, who had given the police a description of the men he saw driving Kretchman's car, was asked to identify them at a lineup. There were four men in the lineup. Leipleim identified Williams as the driver of the car and Lilliock as the passenger.

Defendant contends that his statements to the police officers in Needles were admitted into evidence in violation of the standards enunciated in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado, supra,* 62 Cal.2d 338. He claims that he received no constitutional warning and that former Police Officer Lechner and Deputy District Attorney Busch are guilty of perjury. This accusation is not only unsupported by the record, but is directly contradicted.

The warning that was given was arguably technically insufficient, but introduction of the statement made after the warning was in any event harmless error. Williams was told that from the looks of things he needed an attorney, that he could hire one or wait until he was in Los Angeles and have one assigned; and that he could remain silent in the meantime. Although properly informed that he could remain silent until he secured a lawyer, Williams was not explicitly informed that his right to have a lawyer was a right to have a lawyer not just at trial but, as provided in *Escobedo* and *Dorado,* at the accusatory stage of the proceedings, a stage which was clearly reached by the time the warning in the present case was given. (Compare *People* v. *Thomas,* 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233] ; but cf.

622

*People* v. *Johnson,* 70 Cal.2d 541, 556, 557-558 [75 Cal.Rptr. 401, 450 P.2d 865].)

Even if the warning was deficient, a question we need not and do not decide, a reversal is not required. The statement did not constitute a confession, and its introduction was not prejudicial. ■ The erroneous introduction into evidence of a *confession* requires a reversal of the judgment regardless of other evidence, but the erroneous introduction of an *admission* requires the further determination of whether the error was prejudicial. (E.g., *People* v. *Powell,* 67 Cal.2d 32, 51-53 [59 Cal.Rptr. 817, 429 P.2d 137].)

■ Williams stated that he found Kretchman's car parked at an intersection with the keys in it. This is inconsistent with Leipleim's testimony that he saw Williams drive the car away from the cottage. If the jury believed the statements made to the officers, Williams would not have been convicted of murder, and thus the statement viewed alone was exculpatory. The effect of this evidence at most was to impeach Williams' credibility even though he exercised his privilege against self-incrimination and did not testify. But, the record shows that the introduction into evidence of these exculpatory statements was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].) Williams' credibility was not determinative of his defense. (Cf. *People* v. *Alesi,* 67 Cal.2d 856, 862-863 [64 Cal.Rptr. 104, 434 P.2d 360].) Since he was arrested in Kretchman's automobile, his admission was not necessary to establish his possession of the vehicle. (Cf. *People* v. *Doherty,* 67 Cal.2d 9, 17 [59 Cal.Rptr. 857, 429 P.2d 117].) His presence at the cottage was overwhelmingly established by his fingerprints, independent of Leipleim's testimony. It is inconceivable that his admissions could have been prejudicial.

■ Defendant claims he was denied his right to a speedy trial. The remittitur was filed on June 22, 1965, but the case was not brought to trial until September 24, 1965. Since this delay was greater than the 60 days permitted by Penal Code, section 1382, defendant's motion to dismiss the action was granted. Williams was immediately rearrested upon a new information and subsequently brought to trial. His motion under Penal Code, section 995, to set aside this new information was properly denied. Penal Code, section 1387, provides, "An order for the dismissal of the action, made as provided in this chapter, is a bar to any other prosecution for the same

offense if it is a misdemeanor, *but not if it is a felony."*
(Italics added.) The offense charged was, of course, a felony;
hence, the dismissal under section 1382 did not bar the subse-
quent prosecution. (*People* v. *Combes,* 56 Cal.2d 135, 145 [14
Cal.Rptr. 4, 363 P.2d 4]; *People* v. *Godlewski,* 22 Cal.2d 677
[140 P.2d 381].)

· . Defendant, in essence, argues that section 1387 cannot con-
stitutionally mean what it plainly says. Although there
undoubtedly are circumstances which would make a new
prosecution under section 1387 violative of the constitutional
right to a speedy trial, such circumstances are not here
present.

The delay in the present case of over 90 days was not an
extended delay, and therefore prejudice is not· presumed.
(*Barker* v. *Municipal Court,* 64 Cal.2d 806, 812-813 [51 Cal.
Rptr. 921, 415 P.2d 809].) Defendant has alleged no prejudice
nor does the record indicate any. In the absence of actual
prejudice, defendant cannot complain that he was denied his
constitutional right to a speedy trial. (*People* v. *Wilson,* 60
Cal.2d 139, 154 [32 Cal.Rptr. 44, 383 P.2d 452]; *People* v.
*Combes, supra,* 56 Cal.2d 135, 142.)

 Defendant next argues that the trial court improper-
ly denied his request for an instruction on voluntary man-
slaughter. The jury found defendant "guilty of Murder, in
violation of Section 187, Penal Code . . . in the First
degree." The verdict does not indicate whether defendant
was convicted on the felony-murder or premeditated murder
theory.

 If there was any evidence of voluntary manslaughter,
it was reversible error to refuse to give such an instruction.
(E.g., *People* v. *Wilson,* 66 Cal.2d 749, 757 [59 Cal.Rptr. 156,
427 P.2d 820]; *People* v. *Modesto,* 59 Cal.2d 722, 727-731 [31
Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Carmen,* 36 Cal.2d 768
[228 P.2d 281].) Unlike in *Wilson, Modesto* and
*Carmen,* the defendant did not testify; he chose to exercise
his privilege against self-incrimination. All the evidence con-
necting Williams with the homicide demonstrates that the
killing was done with malice.

"Manslaughter is the unlawful killing of a human being
without malice" and is voluntary when committed "upon a
sudden quarrel or heat of passion." (Pen. Code, § 192, subd.
1.) Malice is presumed when it is proved that the defendant
committed the homicide and "no considerable provocation
appears, or when the circumstances attending the killing show

an abandoned and malignant heart." (Pen. Code, § 188; *People* v. *Conley,* 64 Cal.2d 310, 320 [49 Cal.Rptr. 815, 411 P.2d 911].) ■ Evidence of adequate provocation overcomes the presumption of malice. (E.g., *People* v. *Valentine,* 28 Cal.2d 121, 137 [169 P.2d 1].)

■ Defendant does not contend that the evidence is insufficient to establish that he committed the homicide. Malice is presumed and the burden is on him "to raise a reasonable doubt in the minds of the jurors that malice was present." (*People* v. *Conley, supra,* 64 Cal.2d 310, 320; *Jackson* v. *Superior Court,* 62 Cal.2d 521, 526 [42 Cal.Rptr. 838, 399 P.2d 374].) ■ The pry marks on the door and door frame and the pushed-in window screen indicate that the assailants entered unlawfully. This is bolstered by the ransacked condition of the cottage, and by the fact that the victim's pockets were turned inside-out. The victim was found with one hand tied to the refrigerator, the other hand to a stove, his feet bound and his mouth gagged. The only reasonable inference is that Kretchman was thus tied to render him immobile, and that he was alive at that time and strangled after he had been tied up. Not only is this evidence sufficient to support the presumption of malice, but it is also sufficient to support an inference of express malice.

Admittedly, defendant may have entered the premises lawfully and with innocent intent. It is also possible that Kretchman was already dead when he was bound though his assailants thought he was alive. Although improbable, the defendant is still entitled to any reasonable inference permissible from the evidence. (Cf. *People* v. *Modesto, supra,* 59 Cal.2d 722, 729; *People* v. *Carmen, supra,* 36 Cal.2d 768, 772-773.) Despite these concessions, there is no direct or circumstantial evidence to support an inference that Kretchman unlawfully provoked defendant. The defendant chose not to testify and provide direct evidence. ■ Adequate provocation as an element of voluntary manslaughter must be affirmatively demonstrated; it cannot be left to speculation. [5d] Under these circumstances the voluntary manslaughter instruction was properly refused.

■ Although Williams voluntarily gave an exemplar of his fingerprints, he contends that the police officers should have first advised him that he had a right to have counsel present. Defendant concedes that the exemplar does not violate his privilege against self-incrimination, but be argues that if counsel had been present he could have advised him to

refuse to submit to the examination. Defendant, relying upon *People v. Matteson,* 61 Cal.2d 466 [39 Cal.Rptr. 1, 393 P.2d 161], concludes that the exemplar then could only have been taken by force, and if so taken, it would have been inadmissible.

The answer to this contention is twofold. First, *Matteson* held that the handwriting exemplars procured from the defendant in that case were inadmissible not because they were forcibly obtained but because they were obtained by brutality in violation of *Rochin v. California,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396]. ▉ A defendant may be forcibly fingerprinted provided the means used do not shock the conscience. (Cf. *Schmerber v. California,* 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *People v. Duroncelay,* 48 Cal.2d 766, 770 [312 P.2d 690] [both involving blood tests]; see *United States v. Kelly,* 55 F.2d 67 [fingerprints].) ▉ Second, the taking of a defendant's fingerprints is not a critical stage of criminal proceedings at which a defendant needs the presence of counsel. Therefore, there is no right to the presence of counsel at the taking of fingerprints. (See *United States v. Wade,* 388 U.S. 218, 227-228 [18 L.Ed.2d 1149, 1157-1158, 87 S.Ct. 1926].)

▉ Defendant also contends that he was entitled to the presence of counsel at his lineup. The right to counsel at lineups (*United States v. Wade, supra,* 388 U.S. 218; *Gilbert v. California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]) does not apply to lineups occurring, as did defendant's, prior to June 12, 1967. (*Stovall v. Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *People v. Feggans,* 67 Cal.2d 444, 448-449 [62 Cal.Rptr. 419, 432 P.2d 21].) There is no claim that defendant's lineup in any way denied him due process of law (compare *Stovall v. Denno, supra; People v. Feggans, supra*).

▉ Defendant argues that the trial court erred in admitting People's exhibit 24 which depicted the left side of the victim's scalp. It is claimed that it was admitted to prejudice the jury. This was the only picture to which counsel objected. It does not appear that the trial judge abused his broad discretion in determining that the probative value of the picture was not outweighed by its prejudicial effect. (See *People v. Talbot,* 64 Cal.2d 691, 706 [51 Cal.Rptr. 417, 414 P.2d 633].)

During the selection of the jury that ultimately convicted and sentenced defendant, 12 prospective jurors were excused for cause because of their reservations concerning the death penalty.

At the outset of the *voir dire* examination on Thursday morning, March 3, 1966, and in the presence of the entire jury panel the judge remarked: "I want to tell you all that the law provides no standard as to what is a proper case for the death penalty. It is a matter left in the jurors' sole and complete discretion; in other words, I will not give you any standard nor will counsel try to outline any standard for you. The matter is left solely within your own complete discretion and you all understand that."[1]

The jurors "indicated in the affirmative."

After the judge quickly determined that the first five prospective jurors had no conscientious scruples against imposing the death penalty, he and Mr. Goertzen, the prosecutor, examined a Mr. Miller and Mrs. Barbara J. Gray.

*Mr. Miller* was excused for cause on motion of the prosecutor after the following questioning:

"THE COURT: . . . [D]o you have any conscientious scruples that would preclude you from voting for the death penalty in a proper case? . . .

"MR. MILLER: Yes, I do, your Honor. . . .

"MR. GOERTZEN: . . . Well, in other words, Mr. Miller, if all the facts were in in this case and it became the thought of the other eleven jurors that this was a proper case for the imposition of the death penalty, you could not join them because of your feelings about the penalty?

"A. No, sir, I don't believe in the death penalty."

*Mrs. Barbara J. Gray* was excused for cause on motion of the prosecutor after the following questioning:

"THE COURT: Now, do you have any conscientious scruples that would preclude you from voting for the death penalty in a proper case?

"MRS. GRAY: Yes, I do. . . .

"Q. By MR. GOERTZEN: Well, Mrs. Gray, you heard the question I asked Mr. Miller?

"A. Yes.

"Q. In other words, if eleven other jurors had reached the stage in the proceedings where they felt this was a proper case for the death penalty, you would not be able to join?

"A. No."

---

[1] The judge made this remark after each of the first two jurors he questioned individually replied in the negative to his question whether they had "conscientious scruples that would preclude . . . [them] from voting for a death penalty in a proper case." Earlier, he had told the jurors that they were the sole judges on questions of facts but were to "follow the law as I give it to you, notwithstanding any ideas that you may entertain with respect to the law."

In the afternoon of March 3, *Mrs. Joyce E. Miller* was excused for cause on motion of the prosecutor after the following questioning:

"THE COURT: Now, do you have any conscientious scruples that would preclude you from . . . voting for the death penalty in a proper case?

"MRS. MILLER: Yes.

"MR. LITTLEFIELD [defense counsel]: . . . Mrs. Miller, suppose you were selected as a trial juror in this case and that this case did reach the stage of the proceeding where there was a penalty trial and you, yourself, felt after considering the evidence in this case that it was a proper case for the imposition of the death penalty, under such circumstances would you vote for it?

"A. Well, I just don't believe that I could say to take someone's life.

"Q. And that is your feeling in this case?

"A. No, I couldn't vote for the death penalty."

During the course of the last two days of *voir dire* examination, Friday, March 4 and Monday, March 7, nine other prospective jurors were excused for cause on motion of the prosecutor after replying to the court first, that they had "conscientious scruples that would preclude . . . [them] from voting for the death penalty in a proper case" and second, that they either "would not" or "could not" vote for the death penalty "under any circumstances" or "regardless of the facts" or "no matter what the facts and circumstances were."

During the course of examining prospective jurors who were not excluded for cause on the basis of their attitudes concerning capital punishment, court and counsel clearly explained on four occasions prior to the examination of Mrs. Miller that in the penalty phase of a capital trial each *individual* juror is entitled and expected to make up his own mind whether the case before him is a proper case in which to impose the death penalty. None of these explanations occurred prior to the earlier examination of Mr. Miller and Mrs. Gray.

Defendant claims that the exclusion of these prospective jurors was contrary to the standards established in *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and therefore deprived him of his constitutional right to be sentenced by an impartial jury.

*Witherspoon* holds that "a sentence of death cannot be carried out if the jury that imposed or recommended it was

chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction'' (*id.* at p. 522 [20 L.Ed.2d at p. 784]) because to do so ''would deprive [the defendant] of his life without due process of law'' (*id.* at p. 523 [20 L.Ed.2d at p. 785]). In holding that prospective jurors cannot be excused for cause simply on the basis of *general objections* to the death penalty, the Supreme Court did not have to consider when, if ever, prospective jurors *can* be excused for cause on the basis of their reservations concerning the death penalty. However, the court declared in dictum that a state which excludes only those prospective jurors who affirm that they would not even consider returning a verdict of death ''could argue that the resulting jury was simply 'neutral' with respect to penalty'' (*id.* at p. 520 [20 L.Ed.2d at p. 783]); and that ''nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, . . .'' (*id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 784]).

The court added that ''Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.'' (*Id.* at p. 516, fn. 9 [20 L.Ed.2d at p. 782].) This means that a prospective juror who merely admits to having '' 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' '' cannot on that basis alone be excluded. Before such a juror may be excluded it must be established that his scruples would absolutely prevent him from voting to impose capital punishment in any case. (*Id.*)

Whether an excluded prospective juror has given an answer which constitutes the sort of unambiguous and ''unmistakably clear'' statement of opposition to the death penalty which *Witherspoon* requires often depends upon whether there is any reasonable possibility[2] that the juror

---

[2]*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710], held that a federal constitutional error cannot, be held harmless unless the reviewing court is convinced ''beyond a reasonable doubt'' that it was harmless. *Witherspoon* held that it is federal constitutional error to

construed the *question* to which he was responding in such a manner as to render his *answer* ambiguous in relation to the *Witherspoon* test—his willingness to at least consider the death penalty in the case before him.

This case is one of many recently decided by this court in which the *voir dire* examination of prospective jurors preceded the *Witherspoon* decision and was thus conducted in light of the then-prevailing California law regarding exclusion of prospective jurors because of their opposition to the death penalty, a state of the law materially different from the constitutional standard enunciated in *Witherspoon* (*In re Anderson,* 69 Cal.2d 613, 618-619 [73 Cal.Rptr. 21, 447 P.2d 117]). Our task in such cases is to determine whether in some fortuitous manner the jury selection was in accordance with *Witherspoon* even though *Witherspoon* was not then the law.

When the questions put to jurors ultimately excused for cause because of opposition to the death penalty reasonably approximate the questions suggested by the dictum in *Witherspoon* (see 391 U.S. 510, 522, fn. 21 [17 L.Ed.2d 776, 784]) or contain but clearly explain otherwise ambiguous concepts foreign to the inquiry dictated by *Witherspoon* (e.g., *People v. Varnum,* 70 Cal.2d 480, 491-496 [75 Cal.Rptr. 161, 450 P.2d 553] ["proper case" adequately explained]) we can attain the required certainty beyond a *reasonable doubt* (see fn. 2 *ante,* and accompanying text) concerning what the juror meant by his answers and then determine whether his attitude toward imposing the death penalty qualified him for exclusion from the jury panel.

Unfortunately, the questions put to two of the jurors excused for cause in the present case, Mr. Miller and Mrs. Gray, do not permit us to divine with a certainty that excludes reasonable doubt just what their positions are with respect to imposing the death penalty. There are three reasons.

exclude a prospective juror in a potential death penalty case because of his reservations about voting for that penalty unless he "states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, . . ." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 516, fn. 9 [20 L.Ed.2d 776, at p. 782].) When a juror is excluded for cause on the basis of an answer which is not phrased in these terms, his exclusion should be considered erroneous and grounds for reversal of the penalty determination unless it is clear "beyond a reasonable doubt" that this error was harmless—i.e., clear "beyond a reasonable doubt" that his answer could only be construed as meaning the same thing as the answer *Witherspoon* requires.

First, the use of the confusing phrase "proper case"[3] was not satisfactorily explained. In *People* v. *Varnum, supra,* 70 Cal.2d 480, the prospective juror whose exclusion for cause was under consideration responded "no" to the question: "[U]nder no circumstances *in a proper case* would you ever vote for that type of punishment [the death penalty]?" (See 70 Cal.2d at p. 492, fn. 8; italics added.) We were satisfied that her response amounted to the requisite unmistakably clear statement that she would automatically vote against the death penalty regardless of the evidence because (1) our examination of the record showed that she "clearly understood that it was within *her* discretion to determine what was a proper case" (italics added)[4] and (2) the words "under no circumstances" made it clear that her unqualified negative answer admitted of no exception. (*Id.* at p. 494.) We stated that if we had confined our inquiry to the question asked of the prospective juror in question, "then [her] response—'Not the death penalty, no'—might appear ambiguous because nowhere *in the question* was it made clear to her that it was entirely in her discretion to determine what was a proper case. If we considered nothing more, we could not assume that [she] thereby affirmed 'that [she] could never vote in favor of [the death penalty] or that [she] would not consider doing so in the case before [her].'" (*Id.*)

---

[3]Without explanation, the phrase "proper case," as it is frequently used in *voir dire* examinations conducted in this state prior to *Witherspoon,* leaves the prospective juror in the dark regarding who is to determine or has already determined what cases are "proper" for the death penalty—the Legislature, the courts generally, the particular court in which the case is being tried, the jury collectively, or the jury individually. Even if it is explained that each individual juror has complete discretion to determine what cases are "proper" cases for the death penalty, a question whether a juror could vote for the death penalty in a "proper case" is confusing because it embodies an unwarranted assumption—that the prospective juror being questioned believes there are some such cases. The only meaningful way to use the phrase "proper case" would seem to be first to inquire whether the prospective juror believes there are any such cases and then, if the answer is affirmative, to inquire whether he could consider voting for the death penalty in any such case. (Some people believe there are situations in which, apart from their own views, the death penalty is "proper" or "warranted" but could never themselves cast a vote as a juror to impose it.)

[4]"On numerous occasions throughout the one and one-half days of jury selection prior to the questioning of Mrs. Bronsal the court and counsel made clear that what was a proper case was purely within the determination of each individual juror. Mrs. Bronsal presumably observed and heard such examination of previous veniremen . . . . We know that in fact Mrs. Bronsal *did* listen to the prior *voir dire* from her response that she was able to hear adequately from her seat . . . and also from her reference to the testimony of Mrs. Hokin, a [previously questioned] prospective juror . . . ." (70 Cal.2d at pp. 495-496, footnote omitted.)

In the present case, on the other hand, Mr. Miller and Mrs. Gray did not understand that the determination of a "proper case" for the death penalty rests with each *individual* juror rather than with the jury collectively. All they knew was that "what is a proper case for the death penalty. . . . is a matter left in the *juror's* sole and complete discretion [without guidance from court or counsel]. . . ." (Trial judge's opening remarks, quoted in full in text, *ante*, accompanying fn. 1; italics added.) It was not until after both Mr. Miller and Mrs. Gray had been excused that remarks of the trial judge and counsel began to clarify the ambiguity in the judge's opening remarks.

Second, Mr. Miller and Mrs. Gray, unlike the juror in *Varnum*, were not asked whether they would automatically in *all circumstances* vote against the death penalty in a "proper case." Instead, they were asked whether they had any conscientious scruples that would *"preclude"* them from voting for the death penalty in a "proper case." ▮▮▮ The word "preclude" can mean "prevent." If the prospective jurors so interpreted the word, then they indicated that in no circumstances could they vote to impose the death penalty in a "proper case." However, we cannot exclude the reasonable possibility that they did not so interpret "preclude;" that word is used to also mean "hinder," "impede," "deter," and "moderate" as well as "prevent," "exclude," "frustrate," and "prohibit."[5] Although the latter group of words appears to be more frequently associated with "preclude," it is clear that people use and understand the word in the former sense as well. Indeed, this court has interpreted "preclude" in a context closely analogous to the one before us as meaning far less than "absolutely prevent." Subdivision 8 of section 1074 of the Penal Code provides that in capital cases a prospective juror may be challenged for cause

[5] "Preclude" is defined in Webster's New International Dictionary (3d ed. 1961) as follows:
"1 *archaic*: to put a barrier before: shut up: HINDER, STOP, IMPEDE, CLOSE 2: to shut out or obviate by anticipation; prevent or hinder by necessary consequence or implication: deter action of, access to, or enjoyment of: make ineffectual . . . syn see PREVENT."
In the index to Roget's Thesaurus (1962), "preclude" has two "keywords"—not definitions as such but indicating broadly the sense of the word (see p. xlix)—"exclude" and "restrain." The latter means hinder, act as a brake, moderate, etc., as well as prohibit or prevent.
It should be borne in mind that for nontechnical words, such as "preclude," dictionaries reflect actual popular usage and not abstractly "correct" definitions.

on the ground of implied bias if he "entertain[s] . . . such conscientious opinions as would *preclude* his finding the defendant guilty; . . ." (Italics added.) This court repeatedly held that this section requires exclusion of all jurors whose determination of guilt would merely be "*affected by*" their views on capital punishment. (E.g., *People* v. *Gonzales,* 66 Cal.2d 482, 498 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Ketchel,* 59 Cal.2d 503, 529 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Riser,* 47 Cal.2d 566, 573, 574 [305 P.2d 1].)

The use of the word "preclude," like the phrase "proper case" cannot "taken alone . . . be seized upon as a touchstone by which to determine the quality of the juror under *Witherspoon.*" (*People* v. *Varnum, supra,* 70 Cal.2d 480, 493.) As with "proper case" the ambiguity inherent in the word "preclude" may be sufficiently resolved by the context in which it is used. In the present case, however, Mr. Miller and Mrs. Gray, who were the first two prospective jurors to be excused for cause, had no way of surmising from the brief questioning of five other prospective jurors which preceded their own examination how the word "preclude" was being used. Indeed, if they had any knowledge of the then-existing California law regarding exclusion of jurors because of opposition to the death penalty, they may have known that it was then permissible to excuse jurors who merely " 'did not believe in capital punishment' or who were 'conscientiously opposed to capital punishment' " (*In re Anderson, supra,* 69 Cal.2d 613, 618). The unexplained use of the word "preclude" was thoroughly consistent with this pre-*Witherspoon* standard.

Third, the questioning of Mr. Miller and Mrs. Gray was clouded by a consideration which was relevant neither to then-existing California law nor to the *Witherspoon* standard, and therefore inevitably confusing—an individual juror's willingness to abandon his opposition to imposing the death penalty if his fellow jurors all agree it should be imposed. The questions concerning the "other eleven jurors" may well have misled Mr. Miller or Mrs. Gray into assuming that the law required the determination of penalty in capital cases to be reached by some sort of majority rule within the jury. Their answers to the "other eleven jurors" questions may indicate that they could not, in view of their strong (but not necessarily automatic) opposition to the death penalty agree to be a part of such a decision-making process concerning a convicted defendant's life.

In view of these factors just discussed, we cannot conclude beyond a reasonable doubt that Mr. Miller and Mrs. Gray made it unmistakably clear that they would automatically vote against imposition of the death penalty regardless of the evidence presented to them. Accordingly, reversal of the judgment insofar as it relates to penalty is required. (*In re Anderson, supra,* 69 Cal.2d 613, 620.)

The exclusion of Mrs. Joyce E. Miller was permissible under *Witherspoon* because there is no reasonable possibility that she could have construed the questions directed to her in a manner that would render her replies ambiguous in terms of the *Witherspoon* test. First, the court's explanation of the term "proper case" at the outset of the *voir dire* at least made it clear to all the jurors that there was no legislative or judicial definition of "proper case" which they would be bound to follow. Second, prior to her examination court and counsel had clearly indicated on several occasions that it was up to the individual juror to determine what might be a "proper case" for the death penalty. Third, at the end of her examination, Mrs. Miller stated flatly that she "couldn't vote for the death penalty."

The other nine jurors were also properly excused for cause under the *Witherspoon* standards. Each juror stated that he "could not" or "would not" vote for the death penalty "under any circumstances" or "regardless of the facts" or "no matter what the facts and circumstances were." Thus, these jurors made it "unmistakably clear . . . that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, . . ." (*Id.,* 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 784].)

Having concluded that in view of the particular circumstances of this case—the timing and content of the court's explanation of the term "proper case," the questions asked, and the unequivocal answers given—jurors were properly excused for cause on the basis of questions using the term "proper case," we wish to make it clear that we are not approving the use of this term as a general proposition. In circumstances different than those present in this case, we might be compelled to conclude that a juror's answer to a question using the term "proper case" was not the unambiguous statement of refusal to consider the death penalty required by *Witherspoon*. Since the Supreme Court in *Witherspoon* has clearly specified the ultimate question that must

be answered before a juror may be excused for cause on the basis of his reservations concerning the death penalty, and since the court articulated tĥe required answer in terms which can easily be used in questioning prospective jurors, we must regard with considerable suspicion and disfavor any exclusion of a juror—where the *voir dire* examination was subsequent to the *Witherspoon* decision—which is not based on a question phrased in the terms *Witherspoon* so unmistakably suggests.

 Defendant also contends that the exclusion of prospective jurors opposed to the death penalty deprived him of due process of law because it resulted in a death-oriented and therefore biased guilt jury. A similar contention was rejected by the United States Supreme Court in *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 513-518 [20 L.Ed.2d 776, 779-780]. The court stated that it could not conclude "either on the basis of the record now before us or as matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." (*Id.,* 391 U.S. at p. 518 [20 L.Ed.2d at p. 782].) (Accord, *Bumper* v. *North Carolina,* 391 U.S. 543, 545 [20 L.Ed.2d 797, 800, 88 S.Ct. 1788].) We have rejected such contentions on numerous occasions, for example in *People* v. *Beivelman,* 70 Cal.2d 60, 78-80 [73 Cal.Rptr. 521, 447 P.2d. 913] [all exclusions consistent with *Witherspoon* standard for penalty jury], and in *In re Anderson, supra,* 69 Cal.2d 613, 620-621. (See also *People* v. *Gonzales, supra,* 66 Cal.2d 482, 497-499; *People* v. *Smith,* 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert,* 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365].) In the absence of any documentation that jurors who are not opposed to the death penalty are biased in favor of the prosecution on the issue of guilt or that the jurors in the present case were so biased, we are compelled to follow our prior decisions.

 Defendant attacks the constitutionality of the death penalty on two grounds, arguing *first* that Penal Code, section 190, is unconstitutional because it prescribes no standards for the trier-of-fact to follow in deciding whether to impose the death penalty and *second* that the death penalty itself is unconstitutional because it imposes cruel and unusual punishment. These points have been decided adversely to defendant's contentions by the majority opinion in *In re Anderson, supra,* 69 Cal.2d 613. That case is here controlling.

The judgment is affirmed insofar as it related to guilt and reversed insofar as it relates to penalty.

Traynor, C. J., Tobriner, J., and Peek, J.,* concurred.

BURKE, J.—Finding no error under *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], I dissent from the reversal as to penalty. In all other respects I concur.

McComb, J., and Sullivan, J., concurred.

The petitions of the appellant and the respondent for a rehearing were denied September 17, 1969. Peek, J.,* sat in place of Mosk, J., who deemed himself disqualified. McComb, J., Burke, J., and Sullivan, J., were of the opinion that the respondent's petition should be granted.

_____

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.