Filed 1/20/15  P. v. Nelson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066207 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BLF1100222) |
| DARRIN DEWANE NELSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Richard A. Erwood, Judge.  Affirmed.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Annie Featherman Fraser, Attorneys General, for Plaintiff and Respondent.

Darrin Dewane Nelson appeals from a judgment convicting him of second degree murder.  At trial, the jury was instructed on the lesser included offense of voluntary

manslaughter based on a theory of unreasonable self-defense. Defendant contends the court had a sua sponte duty to also instruct on a heat of passion theory of voluntary manslaughter. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 2011, the police found victim John Whitt lying dead on the ground at a park. He had incurred 93 injuries from being stabbed or cut, including 33 wounds on his head and neck, 48 on his back, chest and abdomen, and 12 on his arms, legs, and hands. He also had 18 blunt force impact injuries on his head. Whitt weighed 364 pounds and had a blood alcohol level of .26.

Defendant was arrested and charged with first degree murder of Whitt. At trial, the prosecution witnesses included two of defendant's neighbors: Royce Long, who was friends with both defendant and Whitt, and Kathleen Miller, who heard an altercation (apparently between defendant and Whitt) at the time of the homicide. The prosecution also introduced evidence which reflected defendant's version of the incident based on statements defendant made to his sister in a letter and in recorded jailhouse phone conversations.

Long testified that Whitt was homeless and lived in a park located across the street from the mobile home park where Long, Miller, and defendant lived. On the evening of the homicide on September 18, Long was with Whitt at the park. Whitt told Long that he was angry at defendant because earlier that day Whitt gave defendant money to buy a bottle of vodka and defendant had not returned. Whitt grabbed a knife and told Long that

2

if he ever saw defendant again, he was going to "butcher him like a pig." When Long left the park, Whitt, who was drunk, was lying on a park bench to go to sleep.

Miller testified that while she was outside on her porch around 11:20 p.m. on the night of the homicide, she heard loud arguing and yelling between two men in the park. After about three to four minutes of arguing, she heard a noise that sounded like metal being struck or "something being struck with an object"; she heard the noise two times and then there was silence. About two or three minutes later she saw defendant rushing out of the park on his bicycle. Defendant was hunched over, riding in an "erratic" manner, and had a backpack or knapsack on his back and various items under his arms.

At the scene of the homicide, the police found a metal pipe with defendant's and Whitt's blood on it. Defendant was arrested around 4:45 a.m. when he was seen walking on a road north of the park. He had blood on his hands, clothing and boots, and a utility knife in his pocket with his and Whitt's DNA on it. Defendant had a deep laceration on one hand, cuts on his other hand, and several scratches or small cuts on his legs and arm. The authorities traced defendant's footsteps to a transient's tent, and in the tent they found a folding pocket knife with defendant's and Whitt's blood on it. Various items belonging to Whitt were found at defendant's residence.

*Defendant's Version of the Incident*

In his statements to his sister, defendant said that at 2:00 p.m. Whitt gave him money to buy vodka, and Whitt was angry because defendant did not return to the park until 8:30 p.m. with the vodka. In the letter to his sister, defendant wrote that Whitt approached defendant "swinging a knife" and said he was going to kill defendant and

3

lunged at defendant in an attempt to cut him. Defendant stuck out his hand and was severely cut. Defendant started hitting Whitt on the head with a pipe and yelled at Whitt to drop the knife. Whitt kept striking at defendant with the knife in an attempt to stab him, and defendant continued beating Whitt with the pipe. When defendant gained possession of the knife, Whitt grabbed defendant by the throat. Fearing for his life, defendant started stabbing Whitt to get away from him. Whitt "would not let go," so defendant continued stabbing Whitt until Whitt fell on top of defendant.

In the recorded phone calls with his sister, defendant answered her numerous inquiries about what occurred. Defendant said that when he returned to the park, Whitt was mad and told defendant, " 'Yeah, I told [Long] that I was gonna gut your fucking ass when I seen you.' " Because Whitt told Long he was going to stab defendant, defendant stated to his sister that Long needed to testify on his behalf to support that he acted in self-defense. When his sister asked why he did not flee when Whitt said he was going to kill him, defendant responded, "Because he rushed me . . . . [¶] . . . [¶] . . . He's 300 pounds, this guy was 300 pounds, he rushed me."

Defendant repeatedly told his sister that he killed Whitt because Whitt was trying to kill him, and he acted in self-defense. He stated that Whitt tried to stab him so he killed "his ass," and he would not kill someone unless they tried to kill him first. Similar to what he stated in the letter, defendant elaborated that Whitt said he was going to kill him and lunged at him with a knife and tried to stab him; defendant stuck his hand out and Whitt cut his hand "wide open"; Whitt kept lunging at him and defendant beat him in the head with the metal pipe; defendant finally grabbed the knife and started stabbing

4

Whitt; and Whitt grabbed him by the neck and arm and would not let go so defendant kept stabbing him. Defendant explained that Whitt had "a hold of [him]" and would not let go so defendant was "reaching around him" and kept stabbing him "all the way around his whole body" as fast as he could.

Defendant acknowledged to his sister that he "went overboard," and variously stated that he panicked; once he got the knife he could not stop stabbing; he "blacked out" and just kept stabbing him; when someone tries to kill him he does not know what he is doing; he "went off on" Whitt because Whitt tried to kill him; and after he stabbed Whitt and Whitt was on the ground he blacked out and kicked him about 15 times. When his sister asked defendant if he was mad, defendant said, "Fuck that mother fucker." When his sister continued by asking "Or were you scared, . . . why did you keep doing it?," defendant responded, " 'Cause I was scared. He kept on coming at me . . . ." During a later conversation when his sister again asked why he did this, he responded: "Because he tried to keep cutting on me . . . , he wouldn't let go, he tried to slice my neck, he sliced my hand open."

Defendant adhered to his claims of self-defense as he repeatedly summed up what occurred, stating, for example: "[I] beat him to a bloody pulp. Then I stabbed the shit out of his ass. . . . But, hey, what could I do? I got stabbed and, luckily I caught the knife in my hand . . . . And lucky I got it in the hand instead of the gut, you know?" "[H]e rushed me. He swung at me. He picked up a stick, a fuckin' piece of metal bar. He was beatin' me with it. I got that away from him finally and beat the hell out of him with it. And then he runs to the table to get the knife and comes at me with the knife. What do I

5

do?"  "[W]hen he fucking picked up that knife and tried to cut my throat and I put my hand against my throat to catch that knife, and I tried to grab that knife out of his hand, okay, he would not let go.  So . . . this piece of metal pipe . . . I picked that up and beat the shit out of him with it.  Okay, and he was still fucking coming after me, so I picked the knife up and stabbed him with that mother fucker again."  "It's self-defense even though I brutalized the fucking guy."  "[I]f somebody's trying to kill me and I can't get away, I'm going to do what I can.  I was in fear of my own safety and my own life . . . and I did what I had to do . . . .  It's . . . self-defense."

*Jury Verdict and Sentence*

The prosecution's theory was that defendant committed first degree murder based on premeditation or felony murder arising from a killing during a robbery.  The defense claimed defendant acted in self-defense and he should be acquitted, or at most he should be convicted of voluntary manslaughter based on unreasonable self-defense.

The jury acquitted defendant of first degree murder and found him guilty of second degree murder, with a true finding on a personal knife use allegation.  The court found true a prior strike conviction, a prior serious felony conviction, and six prior prison term allegations.  The court struck one prior prison term enhancement, and sentenced defendant to an indeterminate term of 30 years to life and a determinate term of 11 years.

DISCUSSION

*Governing Law*

A trial court has a sua sponte duty to instruct on all lesser included offenses supported by the evidence, including "every supportable theory of the lesser included

6

offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) The duty to instruct does not arise if there is any evidence, no matter how weak, in support of the lesser offense, but arises only if there is evidence substantial enough to merit consideration by the jury. (*Id*. at p. 162.) In deciding whether there is substantial evidence of a lesser offense, the court should not evaluate the credibility of witnesses. (*Ibid*.) On appeal, we independently determine whether a lesser included offense instruction should have been given. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

When a defendant intentionally kills, but acts in heat of passion or unreasonable self-defense, the malice element of murder is deemed negated and the offense is reduced to voluntary manslaughter. (*People v. Breverman, supra*, 19 Cal.4th at pp. 153-154.) Heat of passion voluntary manslaughter has both an objective and subjective component: objectively, the victim must engage in provocative conduct that would cause an average, sober person to be so inflamed that he or she would lose reason or judgment and act rashly, and, subjectively, the defendant must actually kill while under the influence of this passion. (*People v. Manriquez, supra*, 37 Cal.4th at pp. 583-586.) Except for revenge, the passion aroused can be any violent, intense, high-wrought, or enthusiastic emotion. (*People v. Breverman, supra*, 19 Cal.4th at p. 163.)

Because the existence of malice is presumed when the circumstances of a killing suggest an intent to kill or conscious disregard for life, provocation and heat of passion must be affirmatively demonstrated. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012,

7

1015.)  To require instruction on heat of passion, it " 'is not enough that provocation alone be demonstrated.  There must also be evidence from which it can be inferred that *the defendant's reason was in fact obscured by passion at the time of the act*.' "  (*Ibid.*, italics added.)

If the evidence can support that the defendant killed with a good faith but unreasonable belief in the need for self-defense, and also that the defendant killed because his reason was obscured by passion in response to the victim's objectively provocative conduct, the trial court should instruct on both unreasonable self-defense and heat of passion.  (*People v. Breverman, supra*, 19 Cal.4th at pp. 148-149, 153-154, 163-164.)  For example, in *Breverman* instructions on both theories were required based on evidence showing that a group of men acted in a taunting, menacing manner in front of the defendant's home including battering his automobile with weapons, and in response the defendant, experiencing fear and panic, shot through a window pane and then came outside and continued shooting toward the fleeing vandals, fatally wounding one of the individuals.  (*Breverman, supra*, at pp. 148, 150-151, 163-164.)

In contrast, if there is evidence supporting that the defendant engaged in self-defensive action, but no evidence supporting that he acted rashly from strong passion rather than judgment, the trial court is not required to instruct on heat of passion in addition to unreasonable self-defense.  (*People v. Moye* (2009) 47 Cal.4th 537, 551, 554.) In *Moye*, the court concluded there was no duty to instruct on heat of passion given the defendant's testimony that "characterized every swing he took with the bat as a defensive response to each of [the victim's] successive advances."  (*Ibid*.)  The court explained,

8

"[A]n instruction on heat of passion is [not] required in every case in which the *only* evidence of unreasonable self-defense is the circumstance that a defendant is attacked and consequently fears for his life. In *Breverman* there was affirmative evidence that the defendant panicked in the face of an attack on his car and home by a mob of angry men and had come out shooting, and continued shooting, even after the group had turned and ran. . . . Here, in contrast, defendant testified he acted deliberately in seeking to defend himself from each successive advance by the victim . . . ." (*Id.* at p. 555.) Summing up its holding, *Moye* stated: "[N]o principle of law required the trial judge below to disregard all the evidence bearing on the defendant's state of mind at the time of the killing in order to find the jury should consider whether he subjectively killed under the heat of passion, when no substantial evidence supported that theory of manslaughter, and the only evidence actually introduced on the point, the defendant's own uncontested testimony, was plainly to the contrary." (*Id.* at p. 541.)

*Analysis*

Defendant contends a heat of passion theory of voluntary manslaughter was supported by the evidence showing that Whitt engaged in provocative conduct by threatening and arguing with defendant, advancing on defendant with a knife, and cutting open defendant's hand, and defendant reacted emotionally, "lost it," and repeatedly hit Whitt and stabbed him over 90 times.

Contrary to defendant's claim, there was no substantial evidence supporting that defendant actually, subjectively killed Whitt as the result of obscured reasoning so as to require instruction on heat of passion. In defendant's communications to his sister,

9

defendant stated that the victim attacked him with a knife and said he was going to kill him. In response, defendant blocked the knife which severely cut his hand and started hitting the victim with a pipe, but the victim would not stop the assault. Defendant managed to get the knife from the victim; the victim continued to assault him; and defendant proceeded to repeatedly stab the victim until the victim collapsed. Defendant insisted to his sister that he killed Whitt because Whitt was trying to kill him, and his statements did not indicate that he killed Whitt for any reason other than his belief in the need to act in self-defense. For example, when defendant referred to Whitt's statement that he told Long he was going to "gut" defendant, defendant was describing why *Whitt* (not defendant) was angry and why Long needed to testify to support defendant's *self-defense* claim. Defendant did not suggest Whitt's statement evoked an emotional response in him that caused him to attack Whitt in an unthinking passion.

Defendant did make statements suggesting that he lost control during the incident and "went overboard" as he repeatedly stabbed the victim, but all of his actions were tethered to his claim that he needed to defend his life in the face of the victim's unrelenting aggression. Notably, defendant did not indicate that he knew he had disabled Whitt but he continued to assault and ultimately kill him because his reasoning was obscured by Whitt's provocative conduct. Rather, defendant made clear that he felt he had to keep assaulting Whitt because Whitt would not stop the attack or let go of him, which supports an unreasonable self-defense theory but not a heat of passion theory of killing. (See *People v. Moye, supra*, 47 Cal.4th at p. 554 [no heat of passion instructions required even though defendant testified he was not in a " 'right state of mind' " when the

victim attacked him; defendant's testimony showed he "was referring to his thought processes being caught up in the effort to defend himself" from the victim].)

Heat of passion "must be affirmatively demonstrated; it cannot be left to speculation." (*People v. Williams* (1969) 71 Cal.2d 614, 624; *People v. Sinclair, supra*, 64 Cal.App.4th at p. 1015.) Because defendant's version of the incident reflected his belief that he was acting in self-defense as the victim continued to attack him, his statements did not provide a basis to infer that he killed as the result of a rash emotional response to the victim's provocation.

Likewise, neighbor Miller's description of hearing two men loudly arguing and yelling at each other did not affirmatively demonstrate that defendant killed Whitt as the result of an inflamed reaction to provocative conduct by Whitt. Mere evidence of an emotional argument, without any information about the contents of the argument or the circumstances of the killing, does not suffice to support that the killing was the result of the defendant's heat of passion response to the victim's provocation.

Because the evidence did not affirmatively demonstrate that defendant was acting rashly rather than from reason and judgment, there was no sua sponte duty to instruct on heat of passion.

Alternatively, assuming the trial court should have instructed on heat of passion, there is no reasonable probability the error affected the outcome. (*People v. Moye, supra*, 47 Cal.4th at p. 541.) The evidence concerning heat of passion was the same as the evidence concerning unreasonable self-defense: i.e., the victim's threat and assaultive conduct and defendant's reaction to this conduct. This is not a case presenting significant

11

evidence of heat of passion distinct from the self-defense evidence. (See, e.g., *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1147-1148.) The primary evidence of heat of passion was defendant's statements concerning the victim's threat and egregiously assaultive conduct and defendant's infliction of a large number of stab wounds on the victim. If the jury had found defendant's claims credible regarding the nature of the victim's conduct, it would likely have found the existence of unreasonable self-defense based on defendant's perceived need to keep attacking the victim to repel the ongoing assault. Because the jury rejected unreasonable self-defense, there is no reasonable likelihood it would have accepted the same evidence as a basis for heat of passion.

## DISPOSITION

The judgment is affirmed.


_____

HALLER, J.

WE CONCUR:


_____

MCCONNELL, P. J.


_____

MCINTYRE, J.

12