Filed 4/10/13  P. v. Ordonez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B238528 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA068187) |
| v. | |
| MARTIN ORDONEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed as modified.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \*

Defendant and appellant Martin Ordonez was convicted by jury of one count of first degree murder of Crystal Zaldivar (Pen. Code, § 187, subd. (a)). The jury also found true the special allegation that he personally used a deadly weapon, a knife, in the commission of the murder (§ 12022, subd. (b)(1)). Defendant was sentenced to a term of 26 years to life in state prison.

Defendant contends the trial court committed reversible error by refusing to instruct on (1) the lesser included offense of voluntary manslaughter, based on imperfect self-defense and heat of passion, and (2) voluntary intoxication causing unconsciousness, as well as its effects on homicide crimes. Defendant further contends the trial court erred by ordering him to pay attorney fees in the amount $400, without notice or an opportunity to be heard. (Pen. Code, § 987.8, subd. (b).) We conclude the trial court did not err in refusing to instruct on voluntary manslaughter, under either theory, and voluntary intoxication causing unconsciousness. We do not decide whether the trial court should have instructed on the effects of voluntary intoxication on homicide crimes as we find any alleged error to be harmless. We therefore affirm. However, we reverse the attorney fee order and strike it from the judgment in that the trial court failed to hold a hearing pursuant to section 987.8, subdivision (b).

## FACTS AND PROCEDURAL BACKGROUND

### 1. The Crime Scene

Sergio Munoz worked for a company that handled maintenance at an apartment complex in the 7000 block of Whitsett Avenue. At about 10:00 a.m., on June 26, 2009, he received a phone call concerning "a rather serious leak in apartment 1," on the first floor. At about 3:00 p.m., Munoz responded to the location, observed the leak and requested a key from the building manager to enter apartment 4, above apartment 1, to identify the source of the leak. The manager did not have a key. Nevertheless, Munoz gained entrance via an unlocked screen door and an open front door. Inside, he saw "Crista," lying on the floor. He closed the door and notified the authorities.

2

Los Angeles Police Officer Joel Gutierrez responded to the location. He, too, saw Crystal lying on the floor. She was not breathing and had no pulse. No one else was inside the apartment, only a small dog (or dogs). Water was overflowing from the bathtub. Gutierrez turned off the bathtub faucet and secured the crime scene.

Los Angeles Police Detective Thomas Townsend responded to the Whitsett apartment complex sometime after 3:30 p.m. En route to apartment 4, he observed what appeared to be drops of blood at the bottom of the stairs, on various steps and at the top of the landing. Townsend entered the apartment and observed Crystal lying on the wet carpet floor. Someone from the fire department had placed a blanket over her.

In the kitchen, Detective Townsend observed six glass slats had been removed from a louvered window and stacked on the counter. The window screen had also been removed. In the bathroom, Townsend observed water on the floor.

Ogbonna Chinwah, MD, Deputy Medical Examiner, Los Angeles County Department of Coroner, observed that Crystal sustained between 40 and 42 sharp force injuries. She suffered 15 stab wounds to her face, seven of the which were fatal, six stab wounds to her neck, all fatal, four stab wounds to her chest, two of which were fatal, and eight stab wounds to her abdomen, none of which were fatal. She had multiple defensive wounds to her hands and arms, and bruising on her forearm, consistent with being held in place. Chinwah determined the manner of death to be homicide and the cause of death to be multiple sharp force injuries. Although Crystal had Carboxy THC and 0.07 percent methamphetamine in her blood, neither contributed to her death.

## 2. The "Robbery"

Around noon, June 26, 2009, Los Angeles Police Department Officer Rafael Tobar responded to an emergency call of an ambulance dispatched to handle a "cutting" at the Whitsett apartment complex. Upon arrival, Tobar spoke to Juan M., defendant's 13-year-old brother. Juan stated that he and defendant were in an alley nearby and were approached by a couple of individuals who tried to rob them.

3

Defendant was taken by ambulance to the hospital. At the hospital, Tobar observed numerous cuts on defendant's hands. Defendant told Tobar that he and Juan were walking down the alley when two male blacks, wearing black ski masks and black clothing, approached from behind and demanded that they give up "whatever they have" "if they didn't want to get hurt." Both assailants were holding knives. One of the robbers lunged at defendant. Defendant grabbed the knife and told his brother to run for help.

Later that afternoon, Officer Tobar returned to the Whitsett apartment and described for Detective Townsend the slices on defendant's hands. Given defendant stated he was robbed at knife point, Townsend suspected the two crimes might be related and defendant may have been "the last person who may have seen these people." Townsend also considered if defendant had stabbed Crystal with a knife without a hilt, he could have caused the injuries to his hands.

### 3. Juan M.'s Statement to the Police

Defendant and Juan were transported to the North Hollywood police station. Detectives Townsend and O'Donnell spoke first to Juan. Juan told the detectives two men with ski masks tried to rob defendant and him at knife point in the alley, and that he ran while defendant fought them off, sustaining cuts to his fingers.

The detectives informed Juan they expected to obtain security video footage of the incident from an adjacent Chevron gas station. A few minutes later, after some cajoling by the detectives, Juan recanted: "The truth is I was at home . . . playing. Then my brother leaves. He's like, stay here. [¶] I said, okay. And then I – I go and get something to eat. . . . [¶] Then I hear he just knocks hard. And . . . I just opened the door. And then I see the cuts. [¶] I said, 'what happened? . . . .' [¶] He's like, 'all right, listen . . . if the police come, tell them . . . that you were with me the whole day and that

4

we went to go back here [*sic*].' [¶] And I said, 'okay.'" Juan added defendant was gone for less than an hour, maybe 10 to 20 minutes.[1]

### 4. *Defendant's Statement to the Police*

Detectives Townsend and O'Donnell informed defendant they had a long conversation with Juan. They asked defendant, "What do you think he told us about the black guys with the ski masks ?" Defendant responded "they weren't true." The detectives then asked if Juan was telling the truth (i.e., there were no black robbers with ski masks). Defendant answered, "Yes."

Defendant then gave a second version of what transpired. He stated he woke up around 7:00 or 8:00 a.m., walked downstairs and "when I was coming back upstairs Crystal's door was open. And then I saw her. I took off my . . . flannel shirt . . . . [¶] . . . I covered her. And then I started crying. And then there was this guy, I don't know who he was, but he had tattoos all over him. . . . He was . . . Hispanic. And he was short. [¶] But he had like – you know when you enter the Marines and you have those kind of tats . . . . [¶] . . . [¶] . . . I saw the kitchen knife, like it was jammed in her. And I took it out. And I got scared because I had my fingerprints on it. And the guy grabbed it and tried to slash me. And I actually did fight him off. [¶] And then he had the window open, and he had jumped out the back window and he ran for his life. And I got scared. And then I was looking out her door. Like, so there was no one there, and then I walked into my house."

After a few minutes of encouraging defendant to do the "right thing," Detective Townsend bluntly asked defendant, "what happened with Crystal?" Defendant responded, "I don't know. It just happened. . . . I just grabbed her. I hit her in the stomach. [¶] . . . [¶] With the knife." He stated, "I just snapped" and "[a]ll I remember is I was on top of her with the knife."

---

[1] Although Juan testified at trial defendant appeared normal when he left the apartment that morning, he corroborated defendant had been huffing while they were playing Xbox, prior to him leaving the apartment.

Defendant explained, "I woke up . . . I kept falling asleep like because I was doing air duster. [¶] . . . I decided to go over and talk to her. And that's when I told her that my girlfriend doesn't want me to talk to her anymore. And . . . she just went off. She's like, 'what the fuck. Fuck that bitch.' [¶] She was saying fuck you for listening to her. And it's like, your whole family is stupid and her family is stupid and she's a stupid piece of shit. That's when I just got mad. [¶] . . . [¶] I grabbed the knife. [¶] . . . [¶] [It was in] the kitchen. I asked her if I could get something to drink."

Defendant added when he stabbed Crystal, she was sitting on the couch, facing the television, petting her dog. Defendant stated, "I grabbed her mouth and I jumped on her and that's when I shanked her in the stomach first. And then I just remembered I kept going and then in her face. Then I guess I missed a couple of times and got myself. [¶] I just remember laying on top of her. I was twitching when I was laying on top of her. I twitched like three times and that's when I realized what the hell I'd done."

Defendant told the detectives he turned on the water in Crystal's bathroom and poured water over her face and stomach. He then kissed her on the forehead and told her he was "very sorry." Defendant removed the window slats and threw the things he touched out the window, including a pillow, a bag, his flannel shirt, a blanket and the kitchen knife. Defendant stated he put all the items in a laundry bag and hid them in the back of the building parking lot.

The interview concluded with the detectives inquiring about air duster. Defendant explained it is used to clean a computer and that one huffs it, adding "it makes you go to sleep." When asked how long the feeling lasts, defendant responded, "I still feel it right now. I've been doing it since yesterday. I probably had like eight cans." Defendant stated he finished three cans that morning, prior to stabbing Crystal.

### 5. *Defendant's Trial Testimony*

At trial, defendant testified he awakened at 3:00 a.m. on June 26, 2009. He was nauseous and his mouth was dry from "huffing" the day before. He went outside to get

6

fresh air and saw Crystal coming home. They chatted for a moment. She suggested, "maybe we should kick it sometime."

Defendant returned to his apartment and tried to sleep, but he felt fidgety. He could not stay still, so he played Xbox and started huffing again. He woke up Juan, and for the next couple of hours they took turns playing Xbox.

Defendant's little sister was having her kindergarten graduation party at her school that morning. Defendant's stepfather and grandparents were attending. Defendant stayed home to watch Juan.

Later that morning, defendant received a phone call from his girlfriend. She was extremely upset upon learning Michael Jackson had died. Defendant unsuccessfully tried to comfort her. Defendant hung up and decided to go outside, maybe to smoke a cigarette. Defendant testified he had been huffing prior to leaving his apartment.

As defendant walked towards the stairs, he thought, "[I] might as well kick it with [Crystal]. I have nothing else to do." Defendant walked to Crystal's apartment and knocked. She was texting when she answered the door. She invited him in and they engaged in pleasantries.

According to defendant, Crystal was just an acquaintance. They did not hang out in the same crowd. Crystal asked defendant if his girlfriend would "trip" if she found out he was with her, in her apartment, alone. Defendant told her his girlfriend would be mad; that she does not like him hanging around with other girls. His response caused Crystal to "flip[] out." She said to defendant: "You're stupid. Why would you listen to her? You know, you're a piece of shit if you do listen to her. Your girlfriend is a bitch."

Defendant responded: "You're no prize either. What makes you better than any other girl? What makes you better than my girlfriend?" Then, "she got real pissed. She got heated. [¶] . . . [¶] I kept telling her to chill. Told her, 'you know what? Can I get a glass of water?' [¶] . . . [¶] Yeah, I was still thirsty because I kept getting sort of cotton mouth. And I went over there to get a glass of water. Also to, you know, give her a little space, you know. She could calm down."

7

Defendant walked the four or five steps to the kitchen to get water; he was feeling uncomfortable, scared and angry. Crystal continued yelling, insulting defendant and his girlfriend. She said, "you don't even know me. You know, I could find people to fuck her up."

Defendant testified he was just getting a glass of water and he hoped Crystal would "just chill for a while. But . . . she kept saying, 'you don't know me. I can find anybody to kill your family. Your little sister or brother, [like] nothing.'" Defendant added, "I wouldn't know why she would bring my family into this, especially my little sister. So it just got me scared someone to do those things [*sic*]." Defendant stated he was afraid Crystal would carry out her threats. "I've known the people she's – she or the rest of her family has come to hang out with. . . . They come try to beat someone up, punk somebody, bring a knife out at a party, trying to rob somebody."

Defendant testified Crystal "kept talking, saying the same things. She find [*sic*] anybody to kill my little sister, my brother, my family like nothing. And I snapped. [¶] . . . [¶] I grabbed a knife. [¶] . . . [¶] On the counter. [¶] . . . [¶] I ran towards her. I covered her mouth, and I stabbed her in the stomach. [¶] . . . [¶] I couldn't take the – hear any more of what she was saying." Defendant reiterated Crystal hung out with "dangerous people," which is why he snapped, took the knife and stabbed her.

He then began "twitching." "I started coming to my senses. And I seen [*sic*] her laying down right there bloody. I got scared and I panicked." Defendant did not realize he had cut himself.

Defendant admitted to removing the slats from the kitchen window and throwing certain items out it, including the kitchen knife, then hiding the items in a storage locker in the parking area. "I hid them because . . . my blood was on it [*sic*], and I was scared." "I wasn't thinking. I was just scared. Fear ran through my veins, through my blood. I did not know what to do." Defendant also admitted he lied to the police, again explaining he was scared.

To demonstrate defendant was cognizant throughout the incident, during cross-examination, the prosecutor engaged the defendant in the following dialogue:

"Q     You thought about it.  What am I going to do to get away with this, right?

"A     Yes.

"Q     You knew when you came to, according to yourself, when you – the first thought that came back to you after you were in the kitchen, you knew you had killed Crystal, correct?

"A     Correct.

"Q     And you knew that you used that knife, correct?  [¶]  . . .  [¶]

"A     Correct.

"Q     Put that in the bag with everything else, and you threw all that stuff out the window, correct?

"A     Yes.

"Q     And it was then you decided, I need to come up with a story to cover up what happened because I got injuries to my hands and I got a dead neighbor, right?

"A     Yes.  I ran to my house.

"Q     Before you even got to your house had you already decided that there was an attempted robbery you were going to make up?  Or was it when you got to the apartment?

"A     No.

"Q     So when you asked your brother to lie for you, which you did do, right?

"A     Correct.

"Q     You had already intended on lying about this?

"A     Yes.

"Q     You already knew you were going to lie to the police about what happened to you at that point, correct.

"A     Correct.

"Q     And you decided to ask your 13-year-old brother to also lie to the police for you, correct?

9

"A    Yes.

"Q    And then you came up with a story about guys in the alleyway with knives and had your brother also tell that story too, correct?

"A    Correct.

"Q    That was your story, right?  I mean you came up with that?

"A    Correct.

"Q    And you came up with the facts that they had knives because you knew you needed to explain the cuts on your hands, right?

"A    Right.

"Q    You're thinking about all of this, right?  This is stuff you've thought, right?

"A    After the fact, yes."

When asked why he never mentioned Crystal's threats during his interview with the police, defendant stated he tried to but was cut off by the detectives.[2]

Defendant conceded, in response to Crystal's threats, he could have simply walked out the front door and left.  He reiterated he snapped when she said she might kill his family and that's when he stopped thinking.  According to defendant, he blacked out and had no idea what was going on while he was stabbing Crystal, although he admitted he remembered covering her mouth, getting on top of her, holding her down and repeatedly stabbing her in the stomach and the face.

As for defendant's use of air duster, the prosecutor and the defendant engaged in the following colloquy:

"Q    Now, you'd been huffing that morning, right?

---

[2]    The following colloquy appears to be when defendant claims the detectives cut him off:

"[DEFENDANT]:   I swear to God that's how it happened.  I would put it on my little sister's life, because I don't --

"[TOWNSEND]:    Okay.  Let's leave your little sister out of this.  Okay.  We've got to leave you sister out of this, okay?  You've already involved your little brother.  Now we've got to leave him out of this. . . ."

10

"A     Correct. . . .

"Q     And the day before?

"A     Correct.

"Q     You didn't snap because you were huffing, right?

"A     No.

"Q     You didn't stab her 42 times because you were huffing, correct?

"A     Correct.

"Q     You'd been huffing, but going over there had nothing to do with huffing, right?

"A     Correct.

"Q     And while you were there, you were just planning on having just a little time hanging out with her, right?

"A     Yeah.

"Q     You started getting mad, right?

"A     Yes.

"Q     And then when she said something about killing your family is when she crossed a line for you?

"A     Correct.

"Q     That has nothing to do with huffing, right?

"A     Nothing to do with huffing."

Defendant stated he took her threats personally.


### 6. Defendant's Toxicologist's Trial Testimony

Defendant called John Treuting, Ph.D., as an expert in clinical and forensic toxicology. Treuting testified "huffing is a term that is used for the inhalation of volatile substances . . . ." Treuting added that huffing a product such as air duster can cause pleasurable effects, in addition to slurred speech, clumsy movement and/or dizziness. Disruption of normal brain activity occurs and the individual does not process information well.

11

According to Dr. Treuting, "you have a confusional state, which can effect [*sic*] both your reasoning and your judgment. And if enough of it continues to be used, some individuals have been shown to be delusional or can hallucinate. And there are cases where individuals die because of, literally, oxygen deprivation." Treuting opined someone huffing three or four cans of air duster over a three-to-five-hour period would be under the influence. He added, "you have more . . . pronounced mind-altering effects if you continue to use it for some protracted period of time."

On cross-examination, Dr. Treuting was asked whether "someone who's huffed could stab someone 42 times and it have nothing to do with the huffing?" Treuting answered, "I think that's possible." Treuting added that one who has huffed is still capable of making decisions, however normal brain function will be impaired and ability to process information will be affected.

### 7. *Jury Instruction Hearing*

Defendant requested lesser included instructions on voluntary manslaughter based on heat of passion and imperfect self-defense. After entertaining argument, the trial court declined to instruct on imperfect self-defense, finding there was "no evidence of immediate danger." The trial court similarly declined to instruct on heat of passion, explaining defendant never suggested he killed Crystal because the things she allegedly said "inflamed him so much that he just wanted to kill her because of what she was saying . . . that's not what he said."

Defendant also requested instructions on voluntary intoxication and voluntary intoxication causing unconsciousness. The trial court declined, explaining "I'm not making a credibility call. That is for sure. And in accepting [defendant's] testimony I cannot say I find substantial evidence of intoxication since [defendant] said [huffing] had nothing to do with anything in this case. He said it multiple, multiple times."

## 8. *The Verdict and Sentencing*

The jury returned a verdict finding defendant guilty of first degree murder, in violation of Penal Code section 187, subdivision (a). The jury also found true the special allegation that defendant personally used a knife in the commission of the murder, within the meaning of section 12022, subdivision (b)(1).

Defendant timely submitted a motion for a new trial. It was heard prior to sentencing. In it, defendant argued the court erred in failing to instruct on imperfect self-defense and heat of passion.[3] The court did not agree and denied defendant's motion for a new trial.

The court sentenced defendant to a term of life on the murder charge, with a minimum eligibility date for parole of 25 years. The court imposed a consecutive one-year term for the personal use of a deadly weapon allegation. Defendant's aggregate sentence was 26 years to life in state prison. The court awarded defendant 929 days of custody credit and imposed various fines and penalties. The trial court also ordered defendant to pay attorney fees in the amount $400, although there is no record of either notice or of a hearing pursuant to Penal Code section 987.8, subdivision (b). This timely appeal followed.

## DISCUSSION

Defendant contends the trial court committed reversible error when it failed to instruct the jury on the lesser included offense of voluntary manslaughter, based on imperfect self-defense and heat of passion. Defendant further argues the trial court committed reversible error by refusing to instruct on voluntary intoxication. Finally, defendant contends the trial court erred by ordering defendant to pay attorney fees, without notice or a hearing.

We disagree with defendant that the trial court erred by refusing to instruct on voluntary manslaughter, based on imperfect self-defense and heat of passion, as well as

---

[3]    Defendant did not argue, either orally or in the written motion, that the court erred by failing to instruct on voluntary intoxication.

13

voluntary intoxication causing unconsciousness. We do not herein determine whether the trial court should have instructed on the effects of voluntary intoxication on homicide crimes as we find any alleged error to be harmless. Finally, we agree with defendant that the trial court erred by ordering him to pay attorney fees, without notice or hearing.

## I.  Voluntary Manslaughter

A defendant has a constitutional right to have the jury determine every material issue presented by the evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 645 (*Lewis*).) In accordance with this right, "[a] court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Lopez* (1998) 19 Cal.4th 282, 287.)

Moreover, "a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present." (*Lewis, supra*, 25 Cal.4th at p. 645.) "Conversely, even on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Breverman*, *supra,* 19 Cal.4th at p. 162.) Evidence is substantial for this purpose if it could cause a jury composed of reasonable persons to conclude that the defendant committed the lesser but not the greater offense. (*Ibid*.)

Voluntary manslaughter is a lesser included offense of murder. Either imperfect self-defense or heat of passion will reduce an intentional killing from murder to voluntary manslaughter by negating the element of malice. (§ 192, subd. (a); *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

### A.  *Imperfect Self-defense*

Defendant contends he snapped and killed Crystal because of her threat to have his family killed. Defendant argues he feared imminent danger to life or great bodily injury

14

because he knew Crystal associated with "dangerous people," and she so stated. Moreover, she was texting when he entered her apartment so she could easily have carried out her threats via text. Defendant contends "the jury could have reasonably inferred he actually believed he needed to use deadly force right then and there to prevent the imminent threat of [Crystal] putting in motion a diabolical scheme to kill his family." We do not agree.

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S*. (1994) 7 Cal.4th 768, 771.) The Supreme Court cautioned, however, that "the doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. [The Supreme Court] also emphasize[d] what should be obvious. Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*."' [Citation.]" (*Id*. at p. 783.)

Imperfect self-defense also applies when a person kills under an actual but unreasonable belief in the necessity to defend another person from imminent peril to life. (*People v. Randle* (2005) 35 Cal.4th 987, 996-997, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) "[O]ne who kills in imperfect defense of others – in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury – is guilty only of manslaughter." (*Id.* at p. 993.)

Here, however, the evidence proffered by the defense "simply was not substantial enough to merit the requested jury instruction." (*People v. Booker* (2011) 51 Cal.4th 141, 183 [defense request for imperfect self-defense instruction properly refused because evidence, including the defendant's own contradictory accounts of the stabbing, was not

15

sufficiently substantial to support giving the instruction].) When defendant stabbed Crystal, she was seated on her couch, facing the television, with her back to him, petting her dog; she was unarmed. The record is devoid of evidence Crystal was still in possession of her cell phone.

Defendant did not allege Crystal was going to have his girlfriend or family members immediately killed. Rather, Crystal's purported statements were conditional threats of possible future harm, such as "I could find people to fuck her up." Moreover, no evidence was presented that either Crystal or the people she associated with had ever killed anyone. At most, defendant testified they were known to rob and beat people up.

Defendant conceded on cross-examination that nothing prevented him from simply walking out of Crystal's apartment. Had he done so, he could have returned to his apartment and called the police to address Crystal's threats, if he was truly in fear for his girlfriend's or his family's safety. Again, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.*, *supra,* 7 Cal.4th at p. 783.) Instead, defendant "snapped" when she said she might kill his family.

Since we find no evidence of imminent danger, we find the trial court did not err in refusing to instruct on voluntary manslaughter based on imperfect self-defense. As such, we find defendant's further contention, that the trial court violated defendant's state and federal constitutional due process and jury trial rights to be unavailing. (See *Breverman*, *supra,* 19 Cal.4th at pp. 162, 165 ["We conclude that the failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. We further determine, in line with recent authority, that such misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome."]; see also *Keeble v. United States* (1973) 412 U.S. 205, 208 ["[I]t is now beyond dispute that the defendant is entitled to an

16

instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater."].)

### B.    *Heat of Passion*

Defendant contends the trial court erred in refusing to instruct on voluntary manslaughter based on heat of passion.  We do not agree.

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion,' . . . and is thus voluntary manslaughter . . . , if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" . . . "'[N]o specific type of provocation [is] required . . . .'" . . .  Moreover, the passion aroused need not be anger or rage, but can be any ""'[v]iolent, intense, high-wrought or enthusiastic emotion'"". . . other than revenge. . . .  'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter. . . .' . . ." (*Breverman, supra,* 19 Cal.4th at p. 163, citations omitted.)

Heat of passion has two elements:  (1) an objective or reasonable person element and (2) a subjective element.  (*People v. Wickersham* (1982) 32 Cal.3d 307, 326-327, disapproved on other grounds by *People v. Barton* (1995) 12 Cal.4th 186.)  The objective element requires "the accused's heat of passion must be due to 'sufficient provocation.' [Citation.]" (*Wickersham,* at p. 326.)  "The subjective element requires that the actor be under the actual influence of a strong passion at the time of the homicide." (*Id.* at p. 327.)

"The test of adequate provocation is an objective one . . . .  The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.  Adequate provocation and heat of passion must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60, citing *People v. Sedeno* (1974) 10 Cal.3d 703, 719; *People v. Williams* (1969) 71 Cal.2d 614, 624.)  "The focus is on the provocation -- the surrounding circumstances -- and whether it was sufficient to cause a

reasonable person to act rashly." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223 (*Najera*).)  Here, we find an average, sober person would not have been so inflamed by Crystal's alleged comments that he would lose reason and judgment.

In *Najera*, *supra,* 138 Cal.App.4th at page 226, calling the defendant a "faggot" was found to be insufficient provocation to cause an ordinary person to lose reason and judgment under an objective standard.  """"A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter."""" (*Ibid.*, quoting *People v. Wells* (1938) 10 Cal.2d 610, 623.)

In *People v. Manriquez* (2005) 37 Cal.4th 547, 586, the victim called the defendant a "mother fucker" and taunted him by "repeatedly asserting that if defendant had a weapon, he should take it out and use it."  The California Supreme Court stated such declarations "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment" and held "[t]he trial court properly denied defendant's request for an instruction on voluntary manslaughter based upon the theory of a sudden quarrel or heat of passion."  (Cf. *People v. Wickersham*, *supra,* 32 Cal.3d at p. 327, disapproved on other grounds by *People v. Barton, supra,* 12 Cal.4th at p. 200 [substantial evidence of strong passion when two police officers who observed the defendant shortly after shooting her estranged husband described her as "hysterical," many of her statements were unintelligible, and several witnesses testified she was very distraught over victim's involvement with another woman].)

Here, the evidence demonstrates defendant was calm both before and after he stabbed Crystal.  In fact, defendant testified it was Crystal who was "pissed," he was just trying to get her to "chill."  Again, Crystal was unarmed, sitting on the couch, with her back to defendant, petting her dog.  She was 17 years old and had been defendant's next-door neighbor for 12 years, without incident.  We find under these circumstances, her purported threats and insults were insufficient to cause a reasonable person to act rashly and therefore, we find the trial court did not err in refusing to instruct on voluntary

18

manslaughter based on heat of passion.

Assuming arguendo the trial court did err in failing to so instruct, we find the failure to do so was harmless. We review error in failing to instruct on a lesser included offense under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Breverman*, *supra,* 19 Cal.4th at p. 165.) When analyzing whether a defendant was prejudiced by a trial court's erroneous decision not to instruct on a lesser included offense, we must decide if it is reasonably probable that the jury would have found the defendant guilty of only the lesser offense. (*People v. Leal* (2009) 180 Cal.App.4th 782, 792.) "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*Lewis, supra,* 25 Cal.4th at p. 646.)

Here, the court instructed the jury that it could consider evidence of provocation in deciding whether the crime was first or second degree murder and it instructed on second degree murder. (CALCRIM Nos. 520-522.) Nonetheless, the jury implicitly rejected any mitigating effect of provocation by finding defendant guilty of murdering Crystal willfully, deliberately, and with premeditation. As such, it is not reasonably probable the jury would have found defendant guilty of only voluntary manslaughter had it been instructed on heat of passion.

## II.     Voluntary Intoxication

### A.     *Voluntary Intoxication Causing Unconsciousness*

Defendant contends the trial court erred by refusing to instruct on voluntary intoxication causing unconsciousness. Defendant argues had the jury been properly instructed, they could have found he acted while unconscious and therefore, he would only be guilty of involuntary manslaughter.

Preliminarily, we note "the 1995 amendments to [Penal Code] *section 22* precludes a defendant from relying on his or her unconsciousness caused by voluntary intoxication as a defense to a charge of implied malice murder," as was also alleged here.

19

(*People v. Carlson* (2011) 200 Cal.App.4th 695, 705, italics added.) Notwithstanding *Carlson*, we are mindful that "[t]o constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts, but is not, at the time, conscious of acting.'" (*People v. Halvorsen* (1970) 42 Cal.4th 379, 417, citing *People v. Newton* (1970) 8 Cal.App.3d 359, 376.) We nonetheless agree with the trial court that the record does not contain substantial evidence defendant was unconscious when he stabbed Crystal to death.

Defendant testified he played Xbox for much of the morning prior to stabbing Crystal to death. When defendant left his apartment to smoke a cigarette, his younger brother testified defendant appeared normal. Defendant even remembered a conversation he had had at 3:00 that morning with Crystal, wherein she suggested they should "kick it" some time. Defendant recalled thinking to himself, "[I] might as well kick it with [Crystal]. I have nothing else to do."

Defendant was able to locate Crystal's apartment and knock on her front door. He was able to notice and recall that she was texting when she first opened the door. He was able to exchange pleasantries with Crystal upon entering and he was able to relate that his girlfriend would be jealous if she knew he and Crystal were hanging out alone.

Defendant even exchanged insults with Crystal, telling her: "You're no prize either . . . . What makes you better than my girlfriend?" Defendant repeatedly told Crystal to chill and had the wherewithal to ask for water, then the presence of mind to walk to the kitchen to find a glass and water, just to give Crystal "a little space." Defendant was able to hear, process and recall Crystal's threats to his family and girlfriend, causing him to be in fear for their safety. Defendant was able to locate and arm himself with a knife to "stop" Crystal.

Most telling of all, though, defendant recalls grabbing the knife from the counter, running towards Crystal from behind, covering her mouth with his hand and stabbing her in her stomach because "I couldn't take the – hear any more of what she was saying." Defendant also recalled getting on top of Crystal, holding her down and repeatedly stabbing her in the face and stomach. After the attack, defendant managed to hide the

20

knife and his bloody clothing and make up a story to tell the police. Finally, Dr. John Treuting, defendant's expert toxicologist, testified that even given defendant's huffing, "he's not unconscious. I mean, he's capable of making decisions."

In short, the evidence is overwhelming defendant was not unconscious during this incident and engaged in purposeful, direct and goal oriented conduct. That defendant does not recall every one of the 42 stab wounds he inflicted on Crystal is not surprising. His testimony, though, "I stopped thinking," "I snapped," and "I was twitching," is woefully inadequate, given the facts set forth herein, to justify instruction on voluntary intoxication causing unconsciousness (CALCRIM No. 626).

Since we find the trial court did not err by failing to instruct on voluntary intoxication causing unconsciousness, we find defendant's constitutional arguments to be without merit.

B.        *Voluntary Intoxication:  Effects on Homicide Crimes*

Defendant requested the trial court to instruct the jury on voluntary intoxication and its effects on homicide crimes, pursuant to CALCRIM No. 625.[4] The trial court declined, finding the evidence in support thereof to be insubstantial. The trial court explained:

> "There was some evidence, I wouldn't call it a substantial amount of evidence, but there was some evidence based on the video that the defendant had been huffing sometime prior and that he may have still been feeling some of the effects. I don't know if I'd go so far as to say if it was substantial evidence at that point; however, when the defendant took the stand and said it had nothing to do with the huffing, that that wasn't even an issue in this case. And he was very clear in his testimony when asked on cross-examination about that. I do not find that there's substantial evidence of voluntary intoxication. At this point I actually find there's virtually no evidence of that based on his testimony."

---

**4**        As the result of the Legislature's 1995 amendment to Penal Code section 22, voluntary intoxication can no longer be used to negate "implied malice aforethought." (*People v. Lam* (2010) 184 Cal.App.4th 580, 585; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1376-1377; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1114-1115.)

21

A trial court has no sua sponte duty to instruct that a defendant's voluntary intoxication may be considered in determining the absence of the required criminal intent. Rather, the defendant must request a voluntary intoxication instruction. (See *People v. Hughes* (2002) 27 Cal.4th 287, 342; *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120.) To warrant the instruction, there must be substantial evidence of the defendant's voluntary intoxication and that "'the intoxication affected the defendant's "actual formation of specific intent."'" (*People v. Roldan* (2005) 35 Cal.4th 646, 715, quoting *People v. Williams* (1997) 16 Cal.4th 635, 677, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In other words, even if requested, "an intoxication instruction is not required when the evidence shows a defendant ingested drugs or was drinking, unless the evidence also shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (*People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661-1663; see also *People v. Ramirez* (1990) 50 Cal.3d 1158, 1180-1183.)

Here, there was substantial evidence defendant had been huffing air duster prior to stabbing Crystal to death. Defendant told the detectives in an interview (played for the jury), that he had been huffing since the day before and that he still felt the affects of his huffing. ("I still feel it right now. I've been doing it since yesterday. I probably had like eight cans.") Defendant added that he finished three cans prior to stabbing Crystal. Juan corroborated defendant had been huffing prior to stabbing Crystal.

Defendant also stated he was "twitching" when he was laying on top of Crystal, explaining, "I twitched like three times and that's when I realized what the hell I'd done." At trial, defendant repeated these statements regarding his huffing, adding he blacked out and had no idea what was going on while he was stabbing Crystal.

Defendant's expert toxicologist, John Treuting, testified someone huffing three or four cans of air duster over a three-to-five-hour period would be under the influence. He added, "you have a confusional state, which can effect [*sic*] both your reasoning and your judgment. And if enough of it continues to be used, some individuals have been shown to be delusional or can hallucinate."

22

A trial court's error in failing to instruct on voluntary intoxication only requires reversal if, "'after an examination of the entire cause, including the evidence,' [we are] of the 'opinion' that it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson*, *supra,* 46 Cal.2d at p. 836.) We need not decide, therefore, whether the trial court should have given a voluntary intoxication instruction despite defendant's testimony that his ingestion of air duster had nothing to do with his actions, because we are not persuaded it is reasonably probable such an instruction would have led to a more favorable result.

Here, defendant testified he stabbed Crystal because he was mad she had threatened to kill his family and again, that huffing played no role in this incident. Defendant's younger brother testified defendant appeared normal and was not angry or upset when he left their apartment to see Crystal. Even defendant's expert toxicologist, John Treuting, conceded on cross-examination that it is possible defendant stabbed Crystal unrelated to his huffing.

As detailed above in our discussion of unconsciousness, defendant's conduct was purposeful and goal-oriented. Defendant had total recall of virtually all that transpired on June 26, 2009. Both before and after the attack, defendant behaved in a rational manner, including hiding evidence and fabricating a story about what transpired so as to avoid responsibility.

Moreover, the jury had before it evidence of defendant's intoxication. Unlike with a lesser included offense – wherein the refusal to so instruct removes potential options from the jury – here, the option of returning a not guilty verdict as to first degree murder and a guilty verdict as to second degree murder remained available to the jury. While defendant's pinpoint instruction on voluntary intoxication was refused, nothing precluded defense counsel from arguing to the jury that voluntary intoxication could negate express malice, deliberation and/or premeditation. Defense counsel chose not to so argue, presumably because defendant's theory was a heated argument, not voluntary

23

intoxication, led to this "heinous homicide."**5** Regardless, we do not herein second-guess defense counsel's tactical decisions.

Defendant now argues the jury could have disbelieved his trial testimony as to the affect huffing had on his mental state when he stabbed Crystal to death. However, if the jury were to completely disregard defendant's testimony, the record would not contain substantial evidence of voluntary intoxication. Alternatively, if the jury were to disregard only that portion of defendant's testimony that Crystal's death had nothing to do with huffing, the jury would be forced to wade through a veritable minefield of lies –told by defendant and his younger brother – resulting in pure speculation as to how huffing actually affected defendant, since he never explained what he meant when he told the detectives "I still feel it right now," and there is no explanation in the record of what it means to "twitch."

We thus find that the evidence supporting the existing judgment is so strong, and the evidence supporting a different outcome is so comparatively weak, there is no reasonable probability the error of which the defendant complains affected the result. (*Breverman, supra*, 19 Cal.4th at p. 177.) Therefore, we find any error by the trial court in refusing to instruct on the effects of voluntary intoxication to be harmless. Given that we find any error to be harmless, we reject defendant's claims of constitutional error.

---

**5** In his opening statement, defense counsel stated "[t]he defense's position is that heated argument led to this heinous homicide, and that's what the evidence is going to show." At no point during his opening statement does defense counsel even mention defendant had been huffing. In closing argument, defense counsel stated with respect to Dr. Treuting's testimony: "I don't know if you want to use it, with respect to the intoxication levels of [Crystal] or my client. But it was testified to. You can consider all the evidence in this case. But no, Dr. Treuting wasn't there. And neither was Detective Towsen [*sic*]."

Defense counsel made no further argument regarding huffing; he did not explain its significance to the elements of first degree murder. Nor did defense counsel, in defendant's motion for a new trial, complain of the trial court's failure to instruct the jury on voluntary intoxication. (Defense counsel only argued the trial court erred in failing to instruct on voluntary manslaughter based on heat of passion and imperfect self-defense.)

### III.    Attorney Fee Order

Defendant contends the trial court improperly assessed attorney fees for two reasons. First, it did so without making a determination that defendant had the ability to pay after notice and a hearing as required by Penal Code section 987.8. Second, given defendant's age (18), employment history and sentence (26-to-life), the trial court could not reasonably have found the unusual circumstances to overcome the presumption in section 987.8, subdivision (g)(2)(B) -- that a defendant sentenced to state prison does not have the ability to pay defense costs. As a result, defendant requests we reverse the $400 fee order and strike it from the judgment.

Under Penal Code section 987.8, subdivision (b), "the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof." The Attorney General concedes defendant did not have either notice of a hearing or the hearing itself. The preferred solution when a trial court fails to make a necessary finding is to remand the case for a new hearing on the matter (See *People v. Flores* (2003) 30 Cal.4th 1059, 1068-1069; *People v. Verduzco* (2012) 210 Cal.App.4th 1406, 1421). Here, however, defendant was 18 years old at the time of his arrest and, according to the probation report, unemployed and living in an apartment with his parents. Defendant was sentenced to 26 years to life in prison and thus has no realistic prospect for gainful employment. Given these facts and the presumption in section 987.8, subdivision (g)(2)(B), which inures to defendant's benefit, remand would be futile.[6] We therefore reverse the $400 attorney fee order and strike it from the judgment.

---

[6]    Penal Code section 987.8, subdivision (g)(2)(B) states in pertinent part: "In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining the defendant's reasonably discernible future financial position. Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense."

## DISPOSITION

The judgment is affirmed.  The $400 attorney fee order is stricken.


KARLAN, J*

We concur:



BIGELOW, P. J.



GRIMES, J.

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.