Filed 2/27/24  P. v. Hill CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061976 |
| v. | (Super. Ct. No. 17CF3186) |
| PRENTIS JOHN HILL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Scott A. Steiner and Jonathon S. Fish, Judges.  Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel, Seth M. Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A killing that would otherwise be murder may be reduced to voluntary manslaughter if the person killed "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).)[1]  A "heat of passion" means the person was provoked and:  "The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."  (CALCRIM No. 570.)

Prentis John Hill killed his girlfriend Shannon Likens.  Hill stabbed Likens 19 times in the head with a screwdriver and strangled her.  Hill testified at a jury trial that he killed Likens right after she told him she was going to have sex with her ex-boyfriend.  The trial court instructed the jury on murder and voluntary manslaughter as a lesser included offense.  The jury asked four questions about the law during its deliberations and found Hill guilty of second degree murder with a deadly weapon.

Hill claims:  (A) the court's responses to the jury's questions were incorrect and/or inadequate; (B) the prosecutor misstated the law and shifted the burden of proof during closing argument; and (C) his counsel was ineffective for failing to object to the errors by the court and the prosecutor.  We find no errors and affirm the judgment.


I

FACTS AND PROCEDURAL BACKGROUND

On December 16, 2017, Hill was living with Likens.  Hill was 39 years old and Likens was 38 years old.  Hill was six feet, two inches tall, and weighed 260 pounds; Likens was five feet, ten inches tall, and weighed 208 pounds.  The couple had met about eight months earlier when they were both patients in a Costa Mesa psychiatric hospital.  Likens suffered from bipolar disorder.

Hill and Likens shared a studio apartment (#209) in Santa Ana, which was located on the second floor above retail businesses.  In the adjoining apartment (#210)

---

[1] Further undesignated statutory references are to the Penal Code.

lived a woman and her 18-year-old son.  The woman had not spoken much to Hill and Likens, other than exchanging pleasantries.  The apartments had very thin walls.

At about 11:15 a.m., the woman and her son heard yelling and screaming coming from apartment #209.  Hill was calling Likens names, such as "'stupid b*tch.'" The woman heard 15 to 20 blows and heard Likens "screaming at the top of her lungs 'please help me.'"  The woman's son went to apartment #209 and banged on the door. The son asked if everything was okay and if Likens needed any help.  He said, "'I'm going to call the police.'"  At that point the noise from apartment #209 ceased.  At about 11:30 a.m., the woman's son returned to their apartment and called 911.

At about 11:34 a.m., the woman saw Hill running down the hallway with a backpack and a laptop.  The son followed after Hill telling him:  "'Is the woman okay? Where are you going?  I called the police.'"  Hill said he was sorry about the noise and went down the stairs.  Hill walked to a nearby parking lot, got in a car, and drove away.

At about 11:40 a.m., police arrived and went upstairs.  Police knocked on the door of apartment #209 and announced their presence, but there was no response. There was blood on the doorknob.  Police got a key from the on-site manager and were able to enter the apartment.

The first officer who entered saw Likens' body lying between the bed and the wall.  Likens was unresponsive and severely injured; there was blood on her face. There were also large volumes of blood splattered on the walls, the bed, and the surrounding area.  There was a bloody screwdriver on the dresser.  The officer saw a garment wrapped around Likens' neck, which he removed in order to clear her airway. The officer could not detect a pulse, so he and another officer performed CPR until paramedics arrived.  At no point did Likens show any signs of life.

At about 6:00 p.m., Hill entered the Costa Mesa psychiatric hospital where he and Likens had met.  Prior to driving to the hospital, Hill had removed the front and rear license plates from his car.  Hill filled out an intake form and talked to an on-duty

3

triage nurse. Hill was sobbing and he said he was really sad. Hill told the nurse, "'I didn't mean to do it. I killed my girlfriend.'" Hill became more lucid as he demonstrated making overhead stabbing motions. Hill said, "'I stabbed her over and over and over several times.'" The hospital contacted the police.

*Court Proceedings*

The prosecution filed an information charging Hill with one count of murder with malice aforethought. The information further alleged Hill had used a deadly weapon (a screwdriver) in the commission of the offense.

The forensic pathologist who had performed an autopsy on Likens' body testified at the jury trial. Likens had sustained at least 19 sharp-force injuries, which included 17 injuries to her face, and two injuries to the right side of her head. Several of the sharp-force injuries penetrated Likens' skull and went into her brain. Likens also had injuries and fractures to her neck. The doctor concluded the cause of Likens' death was "stab wounds of head with ligature strangulation."

During the defense portion of the trial, the triage nurse from the psychiatric hospital testified Hill had checked "'yes'" on some questions on the intake form. Hill indicated: (1) he had difficulty eating or sleeping in the past two weeks, (2) he had thoughts about killing himself, (3) he had a history of suicide attempts, and (4) he was currently hearing voices or seeing visions.

Two psychiatrists from the Costa Mesa psychiatric hospital testified at the trial. One of them had previously treated Hill for suicide ideations (about eight months before the homicide). The psychiatrist testified Hill had previously been diagnosed with schizoaffective disorder, but she "was never one hundred percent certain that he was schizoaffective. I thought he was more depressed." Hill had not been diagnosed as psychotic. The psychiatrist had prescribed Hill various medications for depression, mood stabilization, hypertension, and anxiety. Another psychiatrist testified about a discharge

4

summary she had written concerning Hill (almost two years prior to the homicide).

Hill testified that he had formed a friendship with Likens at the psychiatric hospital. Hill testified he had been employed and was covering all of Likens' living expenses. Hill said their relationship was good. Hill said that sometime after being released from the hospital he felt better and so he "abruptly" stopped taking his medications. Hill testified that in the days before the homicide he felt extremely anxious and could not sleep. Hill said that on the night before he killed Likens, they had gone out to dinner. During the dinner, Hill noticed Likens had been looking on a cell phone at a social media page of a man. Likens said the man was her ex-boyfriend. Hill testified he was upset, and he questioned Likens about the man, but things were okay.

Hill testified that on the morning of the killing he was extremely anxious, he was "falling apart," and he could not sleep. Hill said he could not find his anxiety medication, which he thought Likens had taken. Hill testified he was preparing to go to a work event that morning, and he was frustrated because Likens was supposed to go with him, but she was not getting ready. Instead, Likens was looking at her computer tablet and was being "dismissive and very difficult."

Hill said that he eventually saw what was on the tablet, and he discovered that Likens was again looking at her ex-boyfriend. Hill said he "completely . . . lost it." Hill testified Likens said, "Yeah, I'm looking at him, and I'm going to f*ck him." Hill said he then began attacking Likens. Hill testified: "I recall attacking her, and it was just a rush of attacking her. It didn't seem to last very long, but I do remember . . . stabbing her with the screwdriver . . . I remember looking down at her and looking up at myself and I had the screwdriver in my hand and looking down at her at all the blood. And I couldn't believe what I did and . . . I saw blood all over my shirt and I saw the gory scene and . . . I walked over and I set the screwdriver down and I got my computer -- I took off my shirt . . . and I left. That -- that's what happened."

On cross-examination, Hill testified he did not remember strangling Likens,

5

or her screaming for help while he was killing her, but he acknowledged those things had happened. Hill also acknowledged that he knew it was wrong to kill Likens while he was killing her, and that while he was stabbing Likens, he was calling her a "stupid b*tch."

Over three days of deliberations (14 hours), the jury submitted five juror question forms requesting transcripts, items of evidence, and extra copies of the instructions. The jury also asked four questions about the law (two on day one and two on day three). The court discussed the jurors' inquiries with counsel and then provided the jury with written responses (the four substantive questions and the court's responses are reviewed in the discussion section of this opinion).[2]

The jury found Hill guilty of second degree murder and found true the deadly weapon allegation. The trial court imposed a sentence of 16 years to life. Hill filed this appeal and a related petition for a writ of habeas corpus alleging ineffective assistance of trial counsel (G061976).

II

DISCUSSION

Hill contends: A) the trial court erred when it responded to the jury's four questions about the law; B) the prosecutor committed error during closing argument; and C) his appointed trial attorney provided ineffective assistance.

A. *The Court's Responses to the Jury's Questions*

Hill contends: "The judgment should be reversed because the trial court's responses to questions from the jurors about provocation were incorrect and inadequate." (Capitalization & boldfacing omitted.) We disagree.

"After the jury have retired for deliberation . . . if they desire to be informed

_____

[2] After closing arguments, the trial court judge became ill. A different superior court judge instructed the jury and responded to the juror's inquiries.

6

on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.)

"In general, errors under section 1138 are reviewed for an abuse of discretion." (*People v. Doane* (2021) 66 Cal.App.5th 965, 980 (*Doane*).) A ruling constitutes an abuse of discretion if it is "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) However, under section 1138, "the abuse-of-discretion standard of review applies only to 'the decision to provide [or not provide] further instructions in response to an inquiry.'" (*Doane*, at p. 980.) "'If a supplemental instruction is given, [then] its correctness presents a question of law that [appellate courts] review de novo.'" (*Ibid*.)

In this part of the discussion, we shall: 1) review relevant principles of law regarding voluntary manslaughter; 2) analyze the trial court's responses to each of the jury's four substantive questions (for an abuse of discretion and/or an error of law); and 3) briefly address the parties' remaining contentions.

### 1. Relevant Principles of Law

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) The required "malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when *no considerable provocation appears*, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a), italics added.)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) Generally, there are three kinds of manslaughter: voluntary, involuntary, and vehicular. (§ 192, subds. (a)-(c).)

7

The voluntary manslaughter statute only refers to a killing "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) However, an additional element of voluntary manslaughter is provocation. (See § 188, subd. (a)(2).) "Whether the homicide amounts to murder or to manslaughter . . . does not depend upon the presence or absence of the intent to kill. In either case there may be a present intention to kill at the moment of the commission of the act. But when the mortal blow is struck in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to *adequate provocation*, the law, out of forbearance for the weakness of human nature, will disregard the actual intent and will reduce the offense to manslaughter. In such case, although the intent to kill exists, it is not that deliberate and malicious intent which is an essential element in the crime of murder." (*People v. Freel* (1874) 48 Cal. 436, 437, italics added.)

A homicide that would ordinarily be considered murder is reduced to voluntary manslaughter "if *the killer's reason* was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause *an* "'*ordinary* [*person*] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"" (*People v. Breverman* (1998) 19 Cal.4th 142, 163, italics added.) That is, voluntary manslaughter (heat of passion) has both subjective and objective elements: *the defendant* actually killed in the heat of passion (the subjective element); and the circumstances giving rise to the heat of passion—the provocation—would arouse passion in the mind of an *ordinarily reasonable person* (the objective element). (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)

The provocation "must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59.) "No specific type of provocation is required. [Citation.] The provocation may be anything which arouses great fear, anger or jealousy. [Citation.] Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person. [Citation.] However, where the

8

provocation is so slight or so severe that reasonable jurors could not differ on the issue of adequacy, then the court may resolve the question." (*People v. Fenenbo*ck (1996) 46 Cal.App.4th 1688, 1704–1705.)

A trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder where there is evidence from which a reasonable jury could conclude that sufficient provocation was present. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643 (*Thomas*).) When a defendant puts provocation at issue by making a sufficient showing to raise a reasonable doubt, the prosecution must prove malice beyond a reasonable doubt by proving sufficient provocation was lacking. (*Ibid.*)

*2. The Court's Responses to the Jury's Four Substantive Questions*

First question and response. The jury asked for "clarification" of CALCRIM No. 3428 (mental impairment) as compared to CALCRIM No. 520 (second degree murder). Specifically, the jury asked: "If mental impairment is valid/reasonable, do all 4 criteria for 520 apply (in reference to implied malice)?" The trial court responded: "Yes, please re read 520 in conjunction with 3428 . . . ."

In short, we find the trial court was correct as to the law and the court did not abuse its discretion by directing the jury to reread the relevant instructions.

As to CALCRIM No. 3428 (mental impairment), the court instructed the jury: "You have heard evidence that the defendant may have suffered from a mental disease, defect or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: [¶] First degree murder with 'premeditation and deliberation' (Calcrim 521); or [¶] Second degree murder based on expressed malice —'malice aforethought' (Calcrim 520); [¶] or [¶]

9

Second degree murder based on implied malice — 'knew his act was dangerous to human Life' (Calcrim 520). [¶] If the People have not met this burden, you must find the defendant not guilty of the crime." (CALCRIM No. 3428.)

As to CALCRIM No. 520 (second degree murder), the court instructed the jury: "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant had express malice if he unlawfully intended to kill. [¶] "The defendant had implied malice if: [¶] 1. The defendant intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; AND [¶] 4. He deliberately acted with conscious disregard for human life." (CALCRIM No. 520.)

Here, the jury's request for clarification asked whether the defense of mental impairment (CALCRIM No. 3428) applied to all four elements of the crime of implied malice murder (CALCRIM No. 520). The trial court responded in the affirmative. The court's response was a correct statement of the law and Hill does not appear to be challenging the legal accuracy of the court's first response.

The trial court also directed the jury to reread the two relevant instructions in conjunction with each other. Hill appears to maintain that the court's response was inadequate and required further amplification. We disagree. We find the court's response to the jury's first substantive question was adequate and plainly <u>not</u> an abuse of its discretion. (See *People v. Hill* (1992) 3 Cal.App.4th 16, 23–25 [no abuse of discretion, after consulting counsel and considering the matter, to direct jury to re-read instructions as to which the jury had requested clarifications].)

<u>Second question and response</u>. The jury asked for "clarification" of CALCRIM No. 570 (voluntary manslaughter) and CALCRIM No. 522 (provocation). Specifically, the jury asked: "If the jury agrees that the defendant is not of average

10

disposition, do we have [to] still treat the defendant as if he had an average disposition?" The trial court responded, "yes. Your question regarding 'disposition' is answered in the entire 570 instruction."

In short, we find the trial court was correct as to the law and the court did not abuse its discretion by directing the jury to reread the entire relevant instruction.

As to CALCRIM No. 570 (voluntary manslaughter), the court instructed the jury: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone . . . in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgement [(*sic*)].

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"To prove the defendant guilty of murder, the People have the burden of

11

proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

As to CALCRIM No. 522 (provocation), the court instructed the jury: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (CALCRIM No. 522.)

As noted, the jury asked: "If the jury agrees that the defendant is not of average disposition, do we have [to] still treat the defendant as if he had an average disposition?" The trial court responded in the affirmative, which we find to be legally accurate as to the objective element of voluntary manslaughter. (See *People v. Breverman*, *supra*, 19 Cal.4th at p. 163 [voluntary manslaughter (heat of passion) is present "if the if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"*ordinary [person] of average disposition* . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment""""], italics added.)

The trial court's response also appropriately directed the jurors to consider the remainder of the instruction. That is, even though the jurors may have found Hill <u>not</u> to be a person of average disposition, they were still to "*consider whether a person of average disposition*, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570, italics added.)

Hill argues: "Nothing in CALCRIM No. 570 requires jurors to treat a defendant as though he had an average disposition." We disagree.

Again, voluntary manslaughter (heat of passion) has both subjective and

12

objective elements:  the defendant actually killed in the heat of passion (the subjective element); and the circumstances giving rise to the passion—the provocation—would arouse passion in the mind of an *ordinarily reasonable person* (the objective element). (*People v. Steele*, *supra*, 27 Cal.4th at p. 1253.)  The jury's question appeared to be directed to the objective element—would the provocation cause *a person of average or ordinary disposition* to act under a heat of passion—and the court's response correctly answered the jury's question as to the objective element.

Hill also argues:  "The instruction to 'treat the defendant as if he had an average disposition' was in substance an instruction that appellant *was* a person of average disposition."  Again, we disagree.

The jury's question was:  "*If* the jury agrees that the defendant is not of average disposition, do we have [to] still treat the defendant as if he had an average disposition?"  (Italics added.)  It appears the court took the jury's question at face value, meaning the court accepted the jurors' premise that they did <u>not</u> find Hill to be of average disposition.  The court then properly answered "yes" to the jury's question about the objective element of voluntary manslaughter (heat of passion) and further appropriately directed the jury to read the entire relevant instruction.  (See CALCRIM No. 570.)  It does not appear from the second written response that the court was directing the jury to make any factual findings, one way or the other.

Third question and response.  The jury quoted the following portion from CALCRIM No. 570 (voluntary manslaughter):  "'The defendant is not allowed to set up his own standard of conduct.'"  The jury asked:  "Is this saying that the defendant, if he is in the heat of passion, is unable to set up his own standard [of] conduct OR is this saying that the defendant cannot set up his own standard of conduct.  Ex:  he is unable to set up his own standard because he is in a heat of passion."  The court responded:  "The instructions must be considered in their entirety.  In [CALCRIM No.] 570 the phrase, 'the

13

defendant is not allowed to set up his own standard of conduct' is only a portion of the entire definition.  It is to be read with the next portion of the instruction."

Here, in its third substantive question, the jury quoted only a portion of the jury instruction explaining the law of voluntary manslaughter:  "'The defendant is not allowed to set up his own standard of conduct.'"  (CALCRIM No. 570.)  In its response, the trial court directed the jury to read the next portion of the instruction:  "You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."  (CALCRIM No. 570.)  Hill does not dispute that the official jury instruction accurately states the law.  Thus, we find that the trial court's response was legally accurate.  (See *Doane*, *supra*, 66 Cal.App.5th at p. 980.)

As far as an abuse of discretion, Hill argues:  "Any reasonable judge would have understood . . . that referring the jurors back to the portion of [CALCRIM No. 570] discussing a person of average disposition was not going to help."  We disagree.

When a deliberating jury asks the court a question about the law, it seems that the most prudent course of action is often to simply redirect the jurors to focus on the relevant instruction.  Thus, we find the court did not abuse its discretion when it directed the jury to read the phrase it had quoted in the context of the entire instruction.  (See *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [a trial court has discretion to "decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given"]; *People v. Boyce* (2014) 59 Cal.4th 672, 699– 700 ["it is not reasonably likely the court's response misled the jury," where the court reread a previously misunderstood instruction]; *People v. Najera* (2006) 138 Cal.App.4th 212, 224 [the trial court correctly responded to a jury question about heat of passion by having the jury reread the relevant pattern instruction].)

14

Fourth question and response. The jury's question stated: "570. What is average disposition? Can we consider historical life experiences, upbringing, socio-economic background? Can the court provide examples of someone of average disposition?" The court responded: "It is not the court's role to tell you what your findings should be. It would be inappropriate for the court to provide examples of 'a person of average disposition in the same situation knowing the same facts.' In the sixth paragraph of 200 you are instructed that terms that are not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

In short, we find the trial court did not abuse its discretion because a trial court is not required to provide a jury with the meaning of a term that does not have a legal definition. (See *People v. Raley* (1992) 2 Cal.4th 870, 901 (*Raley*).) In *Raley*, a jury found defendant guilty of first degree murder with a torture-murder special circumstance. (*Id.* at p. 881.) The court instructed that a torture murder is committed "for the purpose of revenge, extortion, persuasion or for any *sadistic purpose*." (*Id.* at p. 898.) During its deliberations, the jury asked for a definition of the term "'sadistic purpose,'" but the court did not provide one. (*Id.* at p. 901.) On direct appeal, defendant argued this was error, but the California Supreme Court disagreed because "there is no *legal* definition of the term. The jurors' common understanding of the term was all that was required. 'There is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence.'" (*Ibid.*, fn. omitted.)

The same rationale applies here. The jury asked the trial court: "What is average disposition?" But there is no legal definition of the term *average disposition*. Therefore, the court was not obligated to provide the jury with a definition. (See *Raley*, *supra*, 2 Cal.4th at p. 901.) Neither was the court obligated to provide the jury with examples of a person of average disposition. (See § 1127 ["The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted

15

to them and of the credibility of the witnesses"].)

Hill argues that the case of *People v. Miller* (1981) 120 Cal.App.3d 233 (*Miller*) compels a different result. We disagree.

In *Miller*, a jury convicted defendant of robbery and assault by means of force likely to produce great bodily injury. (*Miller*, *supra*, 120 Cal.App.3d at p. 234.) During its deliberations, the jury asked for a definition of the term "great bodily injury," but the trial court "replied that it was a fact question to be determined by the jury." (*Id*. at p. 236, fn. 2.) The Court of Appeal disagreed, finding the trial court had committed reversible error: "This court has recently held that . . . the trial judge is not required on his own motion to instruct the jury as to the meaning of the words 'great bodily injury' [citation]. However, where the jury during its deliberations indicates confusion over the meaning of the term and specifically requests a definition of the term, we believe the court must honor the request. When the jury asks for clarification, it no longer can be presumed that the jury understands the meaning of the term. Only by answering the jury request does the court fulfill its duty to instruct on those elements of the case necessary for the jury to reach an informed decision [citation]." (*Id*. at p. 236, fn. omitted.)

What distinguishes the trial court's response in *Miller* from the trial court's response in this case is that the term "great bodily injury" has a legal definition. (See *People v. Drayton* (2019) 42 Cal.App.5th 612, 614 ["'Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate'"].) Conversely, the term *average disposition* has no legal definition; therefore, the holding of *Miller*, *supra*, 120 Cal.App.3d 233*,* does not apply. Rather, the holding of *Raley* applies. (See *Raley*, *supra*, 2 Cal.4th at p. 901, fn. omitted ["there is no *legal* definition of the term. The jurors' common understanding of the term was all that was required. 'There is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence'"].)

In sum, we find the trial court did not abuse its discretion by declining to

16

define the nonlegal term *average disposition*, nor did the court err when it declined to provide the jury with examples of a person of average disposition. Indeed, we find the court wisely referred the jury to another relevant instruction that said: "Some words or phrases . . . have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. . . . Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." (CALCRIM No. 200.)

To reiterate and conclude as to the trial court's responses to the jury's four substantive questions, we find the court correctly stated the law and/or the court did not abuse its discretion in any of its responses.


### 3. *The Parties' Remaining Contentions*

Hill argues, "reversal is required even if this Court concludes the instructions actually given by the trial court in response to the jurors' question[s] were correct. This is because it cannot reasonably be disputed that the jurors were confused about provocation from the start of their deliberations until they rendered a verdict. This, too, requires reversal." In support of this proposition, Hill cites *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*), but we find *Ross* to be inapposite.

In *Ross*, a male defendant and a female victim, "engaged in a hostile verbal exchange, at the culmination of which she slapped [the defendant, who] responded with a blow that fractured her cheekbone." (*Ross*, *supra*, 155 Cal.App.4th at p. 1036.) The jury convicted defendant of aggravated assault and battery after the trial court instructed the jury, over defendant's objection, that a person charged with assault cannot successfully plead self-defense if he was engaged in mutual combat with the alleged victim. (*Id*. at p. 1042.) The trial court refused the deliberating jurors' request to provide a legal definition of "'mutual combat,'" telling them there was no legal definition and instead to rely on their common, everyday understanding of those words. (*Ibid*.) The appellate

17

court held it was error to give the mutual combat instruction at all because the "the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Id*. at p. 1036.) As to whether the trial court's instructional error was prejudicial or not, the appellate court held that the lower court's error was prejudicial (not harmless) because "it is entirely likely that the case was decided on the basis of a mistaken understanding of 'mutual combat.'" (*Id*. at p. 1057, relying on *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, unlike *Ross*, this court has not found that the trial court committed any instructional errors, either in its initial instructions, or in its responses to the jury's questions. Therefore, it is not necessary for us to address the alleged prejudicial effect of any instructional errors, as in *Ross*. Further, we also question defendant's assumption "that the jurors were confused about provocation from the start of their deliberations until they rendered a verdict." We think it is also a reasonable inference that one or more jurors may have simply desired further clarification of the relevant legal concepts. In any event, the jurors were able to reach a unanimous verdict, which presumably means that whatever confusion may have existed was apparently resolved.

Finally, the Attorney General contends that we should not address any of Hill's claims regarding voluntary manslaughter. The Attorney General argues Hill was not entitled to a voluntary manslaughter instruction at all because "the provocative acts in this case . . . were insufficient to cause an average person to lose reason and judgment under an objective standard." We disagree. (See *Thomas*, *supra*, 218 Cal.App.4th at p. 643 [a trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder where there is evidence from which a reasonable jury *could* conclude that sufficient provocation was present].)

The Attorney General acknowledges our Supreme Court has previously held that evidence sufficient to warrant a voluntary manslaughter instruction includes verbal taunts by an unfaithful spouse and the infidelity of a lover. (*People v. Berry*

18

(1976) 18 Cal.3d 509, 513; *People v. Borchers* (1958) 50 Cal.2d 321, 328-329.)

Nonetheless, the Attorney General argues this court "should urge the California Supreme Court to reconsider those antiquated precedents." Respectfully, we decline to urge the Supreme Court to reconsider its precedential holdings.[3]

## B. Prosecutorial Error

Hill contends the prosecutor erred during closing argument by improperly shifting the burden of proof and misstating the law. We disagree.

In this part of the discussion, we will: 1) review relevant legal principles regarding prosecutorial error; 2) summarize the trial court proceedings; and 3) analyze Hill's three claims of prosecutorial error.

### 1. Relevant Legal Principles

We evaluate claims of prosecutorial error (or prosecutorial misconduct) under well-established standards. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests,

---

[3] We note that the legislative branch is generally tasked with the responsibility of amending the law. For instance, the Legislature has amended the involuntary manslaughter statute, in part, as follows: "For purposes of determining sudden quarrel or heat of passion . . . , the provocation was not objectively reasonable if it resulted from the discovery of, knowledge about, or potential disclosure of the victim's actual or perceived gender, gender identity, gender expression, or sexual orientation . . . ." (§ 192, subd. (f).)

and in exercising the sovereign power, of the state.'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.) However, "'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667.)

In reviewing a prosecutor's comments to the jury, "we must view the statements in the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203 (*Cole*).) Generally, a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.'" (*Ibid.*) The relevant question is "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of-remarks in an objectionable fashion.'" (*Id.* at pp. 1202–1203.)

### 2. Trial Court Proceedings

The following is a portion of the prosecutor's initial closing argument: "The defense is entitled to certain instructions, and [provocation] is one of them. And this is the defense['s] attempt to reduce Mr. Hill's crime. If certain facts exist, then he is entitled to it. And provocation can reduce a first-degree murder to second-degree. And it can reduce a second-degree murder to manslaughter. But you have to look at the provocation and make a reasonable determination. Provocation, someone abusing their child in front of you. Someone assaulting a loved one in front of you. A whole host of things. What it's not is someone telling you to 'F' off or making a statement that I'm going to go do 'X' to try to get a rise out of you. That's ridiculous.

"The weight and significance of a provocation is for you to decide. This is where your good and reasonable judgment comes into play. As a lesser and necessarily included offense, the law provides that Mr. Hill is entitled to your consideration, as . . . if he did not commit murder, did he commit some lesser offense. This is not anything I

20

charge because Mr. Hill committed murder. But the law says that a person charged with murder under certain circumstances is entitled to lesser include[d] offenses. And one of the lesser included offenses to homicide is manslaughter. And the theory here is heat of passion. It's either self-defense, imperfect self-defense, or heat of passion.

"The heat of passion argument is that the defendant was provoked. As a result of the provocation, the defendant acted irrationally and under the influence of intent [(*sic*)] emotional -- emotions that obscured his reason or judgment and that the provocation would have caused a person of average disposition to act rashly without due deliberation and, in turn, passion rather than judgment. And a reasonable person is someone -- and the idea is that you're so overwhelmed that you're incapable of making a thoughtful decision. That you're just reacting. That might get you a single stab. That might get you a little choking, but it doesn't give you what he did.

"And it's also not reasonable to think that a person would act so rashly upon someone saying something to them. You must decide whether the defendant was provoked and whether the provocation was sufficient. Both provocation and heat of passion must be affirmatively demonstrated. Again, it's his word, but obviously something enraged him. But the idea that you're enraged and then your excuse is she enraged me, so I get to kill her, and we don't call it murder. Open season on wives that have things to say that enrage -- and/or vice versa."

At that point, defense counsel said: "I'm going to object as improper argument." The court said: "Sustained. Just decide the case based on the facts. Go ahead." The prosecutor continued: "The direct, immediate influence of a provocation, slight or remote provocation, is not sufficient. It is not enough that the defendant simply was provoked. Think about that. The defendant is not allowed to set up his own standard of conduct, all reasonable measures. The idea that [Likens] caused this and that somehow he gets to say that he didn't make any decisions that he just acted, isn't the law, and it's not matched by the facts."

21

The following is a portion of the defense counsel's closing argument: "Now, you're going to get instructions. You're going to be read the instructions in just a little bit. You're going to get a packet as well. But this is a quote from the instructions: 'A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.'

"I know the People said, well, maybe one or two stabbings. There's nowhere in the law that talks about the number of stabbings or the type of reaction a person can have or must have if the average person is provoked into a visceral, angry, intense, emotional reaction."

The following is a portion of the trial court's instructions to the jury: "You must follow the law as I explain it to you even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.)

*3. Analysis and Application*

Hill raises three claims of prosecutorial error, but he did not object in the trial court on any of these grounds, so these claims have been forfeited on appeal. (See *People v. Brown* (2003) 31 Cal.4th 518, 553.) Nevertheless, we shall exercise our discretion and address Hill's claims. (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [an appellate court has authority to reach a forfeited claim]; *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [a reviewing court may exercise its discretion to consider a forfeited claim to forestall an ineffective assistance of counsel claim].)

First Claim of Prosecutorial Error. The prosecutor told the jury, "You must decide whether the defendant was provoked and whether the provocation was sufficient. *Both provocation and heat of passion must be affirmatively demonstrated.*" (Italics added.) Based on the italicized portion, Hill argues the prosecutor improperly shifted the

22

burden of proof because: "Any juror would reasonably have understood this to mean appellant was required to produce evidence establishing that he was provoked and acted in the heat of passion." We disagree.

"In a homicide case, the trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder whenever there is evidence from which a reasonable jury could conclude that a manslaughter, but not a murder, was committed." (*Thomas*, *supra*, 218 Cal.App.4th at p. 643.) "If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case [citation], *the People must prove beyond reasonable doubt* that these circumstances were lacking in order to establish the murder element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 462, italics added.)

The prosecutor did not tell the jury that *Hill* was required to prove that he was provoked and acting in the heat of passion; rather, the prosecutor used the passive voice, reasonably indicating the prosecutor was arguing *the evidence* must show Hill was provoked and acting in the heat of passion in order to reduce the crime from murder to voluntary manslaughter. Further, the particular phrase used by the prosecutor— "affirmatively demonstrated"—is consistent with how the concept has been described by our Supreme Court. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 ["Adequate provocation and heat of passion must be affirmatively demonstrated"]; *People v. Williams* (1969) 71 Cal.2d 614, 624 ["Adequate provocation as an element of voluntary manslaughter must be affirmatively demonstrated; it cannot be left to speculation"].)

We do not think it is reasonably likely that the jurors interpreted the prosecutor's statement in the manner Hill suggests on appeal. (*Cole*, *supra*, 33 Cal.4th at pp. 1202–1203 [the relevant question is "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of-remarks in an objectionable fashion'"].) Indeed, we presume that followed the court's instruction regarding involuntary manslaughter and the People's burden of proof. (See CALCRIM No. 570

23

["*The People have the burden* of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder"], italics added; see also *People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

In sum, we do not find prosecutorial error based on Hill's first claim on appeal that the prosecutor improperly shifted the burden of proof.

Second Claim of Prosecutorial Error. Hill argues: "The prosecutor twice incorrectly stated the 'person of average disposition' in a manner that was contrary to law." (Boldfacing omitted.) We disagree.

During closing argument, the prosecutor said: "And a reasonable person is someone -- and the idea is that you're so overwhelmed that you're incapable of making a thoughtful decision. That you're just reacting. *That might get you a single stab. That might get you a little choking, but it doesn't give you what he did.*" (Italics added.) Based on the italicized portion, Hill claims: "Thus the prosecutor argued the juror could not find appellant killed [Likens] because he was provoked because a person of average disposition would not have done 'what [appellant] did.' Such a person might have stabbed her once or choked her a little, but not killed her."

The prosecutor also said: "And it's also not reasonable to think that *a person would act so rashly* upon someone saying something to them. You must decide whether the defendant was provoked and whether the provocation was sufficient." (Italics added.) Based on the italicized portion, Hill claims: "Any reasonable juror would have understood the prosecutor as telling them they could not find appellant was provoked unless the person of average disposition would have reacted 'so rashly,' i.e., as rashly as appellant reacted."

24

Again, we do not think it is reasonably likely that the jurors interpreted the prosecutor's two statements about a person of average disposition in the same manner Hill interprets the prosecutor's statements. Taken in the context of the closing argument as a whole, the prosecutor was not simply explaining the relevant legal concepts necessary for the jury to understand regarding voluntary manslaughter (heat of passion, provocation, person of average disposition, etc.). The prosecutor also appeared to be weaving into his explanations of the law his *closing arguments* to the jury based on the facts of this case and generally arguing that Hill "did not kill as the result of sudden quarrel or a heat of passion." (See CALCRIM No. 570 ["In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it"].)

The jury was free to reject the prosecutor's interpretation of the evidence, but the prosecutor was not restricted from making his arguments in a manner he deemed to be persuasive. (See *People v. Bandhauer* (1967) 66 Cal.2d 524, 529 ["Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness'"].)

In sum, we do not find that the comments made by the prosecutor about a person of average disposition constituted prosecutorial error. (See *People v. Najera, supra,* 138 Cal.App.4th at p. 224 ["The trial court correctly instructed the jury to follow the court's instructions, not the attorneys' description of the law, to the extent there was a conflict. We presume the jury followed that instruction"].)

Third Claim of Prosecutorial Error. The prosecutor told the jury, "And it's also not reasonable to think that a person would act so rashly *upon someone saying something to them*. You must decide whether the defendant was provoked and whether the provocation was sufficient. . . . Again, it's his word, but obviously something enraged him." (Italics added.) Based on the italicized portion, Hill argues, "it was error for the prosecutor to suggest to the jurors that words alone could not be sufficient

25

provocation." We disagree.

"The provocative conduct by the victim may be physical or verbal, *but the conduct must be sufficiently provocative* that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee*, *supra*, 20 Cal.4th at p. 59, italics added.) That is, it is true that "words alone" may be sufficient provocation, but it is the jury's role to decide if the words used by the victim were sufficiently provocative.

Here, toward the beginning of the prosecutor's argument regarding provocation, the prosecutor said to the jury: "But you have to look at the provocation and make a reasonable determination. Provocation, someone abusing their child in front of you. Someone assaulting a loved one in front of you. A whole host of things. What it's not is someone telling you to 'F' off or making a statement that I'm going to go do 'X' to try to get a rise out of you. That's ridiculous."

Taken in context, the prosecutor did not appear to state—as a matter of law—that words alone could *never* constitute sufficient provocation to reduce a crime from murder to voluntary manslaughter (or from first degree murder to second degree murder). Rather, it appears the prosecutor was arguing to the jury that Likens' purported statements to Hill on the morning of her killing were not *sufficiently provocative*. And again, we presume that the jury followed the court's instruction that "no specific type of provocation is required." (CALCRIM No. 570.)

To reiterate and conclude as to the prosecutor's closing argument, we find that none of the statements identified by Hill constitute prosecutorial error. (See *Cole*, *supra*, 33 Cal.4th at p. 1203 [a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide'"].)

26

*C. Ineffective Assistance of Counsel*

Hill contends: "Trial counsel failed to provide effective assistance by not objecting when the trial court provided incorrect and inadequate responses to questions about malice and provocation asked by the jurors during deliberations." (Capitalization & boldfacing omitted.) Hill also contends: "Trial counsel provided ineffective assistance if he did not adequately object to the legally incorrect arguments made by the prosecutor." (Capitalization & boldfacing omitted.)

We find no merit to Hill's contentions. We have rejected Hill's claims regarding the trial court's responses to the jury's questions. And we have rejected Hill's claims regarding prosecutorial error. As there was no legal basis for Hill's trial counsel to object, counsel's failure to object did not fall below an objective standard of reasonableness under prevailing norms, which is a prerequisite to a finding of ineffective assistance.[4] (See *Strickland v. Washington* (1984) 466 U.S. 668, 686–688.)

---

[4] We are summarily denying Hill's related petition for a writ of habeas corpus and its associated motions in a separate order (G062797).

### III

### DISPOSITION

The judgment is affirmed.


                                    MOORE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.